UNITED STATES of America,
Plaintiff–Appellee,

v.

Willie E. LLOYD, Defendant–Appellant.

No. 94–3665.

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1995.

Decided Dec. 5, 1995.

tion as well as the denial of his motion to quash the warrant. We AFFIRM.

## I. FACTUAL BACKGROUND

On March 6, 1994, Detective Anthony Wojcik of the Chicago Police Department ("CPD") received information from a confidential informant ("CI") that Willie E. Lloyd was in possession of two handguns. Lloyd and the CI were members of the Vice Lords, a Chicago street gang, and Lloyd was the leader of the faction known as the Unknown Vice Lords. The CI, who belonged to the Conservative Vice Lords, informed Wojcik that late in the evening of March 5, he met Lloyd in an apartment on West Jackson Street in Chicago, Illinois. He described the building as a "brown brick, six-flat unit on the southeast corner of Jackson and Keeler," and informed him that the apartment was on the first floor, on the west side of the building. The CI also told Wojcik that the door to the apartment was bordered in white stone.

While the CI was in the flat with Lloyd, the defendant displayed two black handguns to the CI: a 9mm Ruger semi-automatic pistol which was loaded as well as a 9mm Glock semi-automatic pistol, also loaded.[1] When Lloyd exhibited these firearms, he stated that he kept them in the apartment for "security purposes." After showing the CI his firearms, Lloyd placed them on a shelf in the closet of the rear bedroom, located directly off the kitchen.

After learning this information, Detective Wojcik (accompanied by the CI) drove to the apartment and observed the building at the southeast corner of Jackson and Keeler which matched the description given by the informant. Wojcik also had the CI point to the windows of the defendant's apartment. The CI thereafter identified Willie Lloyd from an array of photographs. The detective ran a records check on Lloyd and discovered that he had been convicted of second degree murder and aggravated burglary in Iowa in 1973, as well as having been twice convicted in Chicago of unlawful use of a weapon by a felon (1989 and 1990).

Barry Rand Elden, Chief of Appeals, Sergio Acosta (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for U.S.

John A. Meyer, Chicago, IL, Standish E. Willis (argued), Chicago, IL, for Willie E. Lloyd.

Before BAUER, COFFEY and MANION, Circuit Judges.

COFFEY, Circuit Judge.

A federal grand jury indicted Willie E. Lloyd of being a felon in possession of a firearm, a 9mm Ruger semi-automatic pistol, in violation of 18 U.S.C. § 922(g)(1). Lloyd filed a pre-trial motion to quash the warrant authorizing the search of his person and apartment; the motion was denied. Lloyd was convicted before a jury and sentenced to a term of ninety-six months imprisonment, to be followed by a three year term of supervised release, and ordered to pay a special assessment of $50. Lloyd appeals his convic-

---

1. The Ruger and the Glock weapons were loaded with 9mm cartridges.

Based upon this information, the officer prepared an affidavit in support of a search warrant and appeared with the CI before a Cook County Circuit Judge who found that there was probable cause to believe that Lloyd was a felon in possession of a firearm and issued the warrant for the search of Lloyd's person and the first floor west apartment in the building. The warrant was executed by ten officers of the CPD and Agent Marianos of the Federal Bureau of Alcohol, Tobacco, and Firearms at approximately 10:15 p.m., on the evening of March 6, 1994.

At trial, Lt. John Farrell testified that he led several CPD officers and Agent Marianos to the building identified in the warrant, and observed an individual in the front room of the west apartment on the first floor. That person then disappeared from view and Farrell heard a male voice from within the flat shouting "Five–O."[2] Farrell stated that he and the officers proceeded to the door to the first floor west apartment, and that when he arrived at the door, he "pounded on the door and . . . yelled, 'Police officers. Open up. We have a search warrant.'" When there was no response, Farrell ordered Sgt. Edward Mingey to open the door with a sledge hammer.

Lt. Farrell and Sgt. Mingey testified that after the forcible entry into the apartment, they observed Lloyd standing in the rear of the flat, with a "dark colored" firearm in his right hand. As Farrell hollered "He's got a gun," Lloyd ran into the bedroom off the kitchen, and closed and dead-bolted the door. Lt. Farrell broke down the door and upon entry witnessed Lloyd, standing near a window on the west wall of the bedroom, throw a gun out through a broken window with his right hand. He immediately placed Lloyd under arrest.

While Farrell, Mingey, and a few other officers were gaining access to the apartment, CPD officers Lawrence Knysch and Victor Rodriguez stood on the west side of the apartment building. At trial, Knysch and Rodriguez asserted that the area around the apartment building was well illuminated with street lights as well as from light coming through a window in the west apartment on the first floor. The officers also testified that they heard their companion officers enter the apartment, followed by a lot of noise and commotion. Knysch stated that while he was on the outside detail some twenty five feet away from the window, he witnessed the defendant Lloyd pull back a shade, bang on the window above them with a gun in his right hand, break the glass, and throw out the gun. Rodriguez testified that he was approximately fifteen feet from the window, and that he was positive that he saw Lloyd throw the firearm from the window.

Knysch and Rodriguez retrieved the loaded 9mm Ruger semi-automatic handgun, and Rodriguez immediately yelled up to the officers inside the apartment that he and Knysch had recovered the Ruger. Farrell stated that he then conducted a pat-down search of Lloyd, as the defendant stated: "You got me. You got me. My brothers should have been out there."

While Lt. Farrell was arresting Lloyd, Sgt. Mingey found Shean Fisher (also known as Shean Woods) and Che Williams laying on the floor in the middle bedroom of the apartment. When Officer Rodriguez searched the closet of this bedroom, he discovered a third weapon, a loaded .25 caliber Lorcin handgun under some clothes. At the time of the search, the following individuals were also present in the apartment: Renee Fitzgerald and Keith Melton, Kim Taylor,[3] Ms. Taylor's six children, and Mookie Lloyd, the defendant's three year old son.

The government called Fisher, who was seventeen years of age at the time of his arrest, to testify at trial. He stated that Lloyd was the chief of his street gang, the Unknown Vice Lords, and that he and Williams, then sixteen years old, were Lloyd's security guards on the night of his arrest. According to Fisher, their duties

---

**2.** At Lloyd's detention hearing, Officer Cronin, a Chicago Police Officer who worked with the Gang Investigations Section, testified that "Five–O" is a warning sign that is commonly used to indicate the approach of the police.

**3.** Taylor, whose real name is Melita Williams, is the lessee of the apartment.

included watching the apartment "to make sure nothing or no one don't come through there," protecting Lloyd from rival gang members, and to warn him if the police were approaching. As security guards, Fisher and Williams were positioned near the front door of the apartment, and Fisher stated that they were usually armed. At the time of Lloyd's arrest, Fisher was carrying the .25 caliber Lorcin, but Williams, who according to Fisher ordinarily carried the Ruger while on guard duty, was unarmed.

Fisher stated to the court that as he observed the police approaching the apartment building, Williams began shouting "Five–O!" The guards then ran to the back bedroom to warn Lloyd that police officers were in the process of surrounding and entering the building. Fisher stated that he handed the Lorcin to Williams, who threw it onto the floor in the closet in the middle bedroom. Fisher and Williams then laid down and remained on the floor in the room until they were discovered by Sgt. Mingey. Fisher stated that Lloyd had shown him how to operate the Ruger two days earlier.

The prosecution also called Officer Michael Cronin to testify. Cronin had been employed by the CPD for 23 years, and spent the last thirteen years of his tour of duty in the Gang Investigations Section. He had been assigned to the west side area in the city of Chicago for the last ten years, and stated that he was familiar with both Lloyd and the Vice Lords, including the defendant's faction, the Unknown Vice Lords. During the time Cronin was investigating the Vice Lords, he testified that he had occasion to speak with Lloyd, who informed the officer that he was the leader of the Unknown Vice Lords. Cronin further stated that he had previously observed Lloyd accompanied by fellow gang members acting as "security guards," and that within the year before the defendant's arrest, there were two separate attempts on Lloyd's life from members of rival street gangs.[4]

Lloyd called Renee Fitzgerald, his girlfriend and the mother of his son, to testify on his behalf. She asserted that on the evening of March 6, she and Lloyd were in the rear bedroom of the apartment, changing their son's diaper, when she heard someone in the apartment shouting "Five–O!" She further stated that at this time, Williams knocked on the rear bedroom door, and that when she opened it, Williams handed her the Ruger and asked her to get rid of it. According to Fitzgerald, upon receiving the gun, she closed and locked the door, broke the rear bedroom window with her fist, and threw the gun to the ground. When queried during cross-examination if she injured her hand as she broke the window, she stated no and that she had only sustained a scratch. She contended that she had not seen Lloyd in possession of a gun at any time during that day. On cross examination, she admitted that Fisher and Williams were security guards for Lloyd, and that Williams carried the Ruger as part of his guard duties. She also contradicted Fisher's testimony by stating that Lloyd was no longer the leader of the Unknown Vice Lords at the time of his arrest, although he had once been the faction's chief.

During the course of the trial, Lloyd's attorney issued a subpoena for Terry Wilson, a reporter for the *Chicago Tribune*. Ms. Wilson previously had written an article about the second assassination attempt on Lloyd, published on October 20, 1993. In the article, Wilson referred to an "investigator familiar with Lloyd" as stating "We've got a lottery going on whether he makes Christmas or not," meaning that given the assassination attempts on the defendant's life, the police officers believed that a rival gang member would strike again in the near future. The officers who testified at trial were questioned about whether they were aware of the alleged "lottery," and all denied knowledge of it. Lloyd's counsel stated that he desired to question Wilson concerning whom she interviewed for the article, and if any of the officers who were involved in the investi-

---

4. Prior to trial, the government filed a motion in limine, seeking to admit Cronin's testimony in order to establish; (1) the context of the defendant's statement "My brothers should have been out there;" (2) the relationship between Lloyd, Williams and Fisher; and (3) the defendant's motive to possess the Ruger as protection in case there were any more assassination attempts. Over Lloyd's objection, the trial court admitted the evidence.

gation of the instant case admitted to her that they were familiar with this alleged "lottery."

Counsel for the *Chicago Tribune* filed a motion to quash the subpoena, arguing that Lloyd failed to demonstrate "that all other available sources of information have been exhausted," 735 ILCS 5/8–907(2), or that Wilson's testimony "goes to the heart of [and] is crucial to" Lloyd's case, *Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Co., Inc.,* 455 F.Supp. 1197, 1202–03 (N.D.Ill.1978), such that it would overcome Wilson's First Amendment or Illinois statutory reporter's privilege, 735 ILCS 5/8–901 (1995), to keep her sources confidential. The district judge agreed, finding that the information defense counsel sought could not overcome the privilege in that it would be "collateral impeachment at best," because it was not relevant to the issue of whether or not Lloyd was in possession of the Ruger on the night of his arrest.

The jury returned a verdict of guilty, and the trial judge entered a judgment in accordance with the verdict, finding that Lloyd was guilty of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The defendant was sentenced to serve a term of imprisonment of ninety-six months, to be followed by three years supervised release, and ordered to pay a special assessment of $50.

## II. ISSUES

Lloyd raises four issues on appeal. He claims that the district court (1) committed clear error when it denied his motion to quash the search warrant; (2) abused its discretion when it admitted Officer Cronin's testimony concerning the assassination attempts on Lloyd's life, the defendant's statement at the time of his arrest about his "brothers," and that he employed security guards to establish his motive for possessing the handguns; (3) erred when it instructed the jury that they could find him guilty of being a felon in possession of a firearm if they determined that he had either actual or constructive possession of the weapon; and (4) abused its discretion when it granted the *Chicago Tribune's* motion to quash the sub-

poena for the reporter Wilson's testimony, thereby precluding defense counsel from questioning her about the "lottery" concerning Lloyd.

## III. DISCUSSION

### A. THE SEARCH WARRANT

■ Lloyd argues that the district court committed clear error when it denied his motion to quash the search warrant. He maintains that the affidavit Detective Wojcik used to obtain the warrant failed to set forth facts sufficient to establish the CI's reliability or veracity, and that the information contained therein was insufficient to corroborate, much less support a finding of probable cause to believe that he was a felon in possession of a firearm.

■ When reviewing the affidavit attached to a search warrant and a judge's issuance of the warrant, "the task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the [judge's] decision to issue the warrant." *Massachusetts v. Upton,* 466 U.S. 727, 728, 104 S.Ct. 2085, 2085–86, 80 L.Ed.2d 721 (1984). "[C]ourts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common-sense, manner." *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (quotation omitted, alterations in original). "[S]o long as the [judge] had a substantial basis for … conclud[ing] that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.* (quotation omitted). "We review the [judge's] findings for clear error." *United States v. Buckley,* 4 F.3d 552, 555 (7th Cir.1993), *cert. denied sub nom., Herman v. United States,* —— U.S. ——, 114 S.Ct. 1084, 127 L.Ed.2d 400 (1994).

■ "Rather than viewing bits and pieces of a probable cause showing in isolation, the court must focus on all the facts presented to the [judge]." *United States v. Markling,* 7 F.3d 1309, 1317 (7th Cir.1993). In *Gates,* the Supreme Court enunciated the totality-of-the-circumstances approach to de-

termining if probable cause exists which "permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip." *Id.* at 234, 103 S.Ct. at 2330.

> The task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

462 U.S. at 238, 103 S.Ct. at 2332.

■■ "[F]irst-hand observations [by a CI] support a finding of reliability." *Buckley,* 4 F.3d at 555–56; *see also Gates,* 462 U.S. at 234, 103 S.Ct. at 2330 ("even if we entertain some doubt as to an informant's motives, his *explicit and detailed description* of alleged wrongdoing, along with a statement that the event was *observed first hand,* entitles his tip to greater weight than might otherwise be the case."). The degree of detail that an *informant* provides, as well as the corroboration by an officer's independent investigation of the informant's information, also serve to support a finding of reliability. *United States v. Pless,* 982 F.2d 1118, 1125 (7th Cir.1992).

We agree with the trial judge's denial of the defendant's motion to quash, in light of the following facts which serve to establish that Wojcik's affidavit, and the information contained therein, were sufficiently detailed and reliable to establish a finding of probable cause: (1) the CI was a fellow gang member of the defendant and had first hand knowledge of Lloyd's possession of the handguns within the 24 hour time period prior to the issuance of the search warrant; (2) he gave Detective Wojcik detailed descriptions of the building, the location of the apartment and the weapons within the building; (3) Wojcik independently verified that the CI's description of the building were accurate.

■■ Additionally, we recognize that when a CI accompanies the officer and is available to give testimony before the judge issuing the warrant, his presence adds to the reliability of the information used to obtain the warrant, because it provides the judge with an opportunity to "assess the informant's credibility and allay any concerns he might have had about the veracity of the informant's statements." *United States v. Causey,* 9 F.3d 1341, 1343 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1412, 128 L.Ed.2d 83 (1994). In the case at hand, as noted by the trial judge in his minute order:

> It is important to note that the CI appeared before the issuing Judge ... and was available to answer under oath any questions put to him by the Judge regarding the truth of the information contained in the affidavit. [The judge] obviously found the CI to be credible and the information to be reliable. Such findings are entitled to deference on review.

In light of the totality of the circumstances enumerated, *Gates,* 462 U.S. at 234, 103 S.Ct. at 2330, we hold that the affidavit and the information contained therein, were sufficiently reliable and detailed to support the issuance of the warrant for the search. Thus, the district court did not commit error in denying Lloyd's motion to quash the warrant for the search of his person and apartment.

## B. EVIDENCE OF PRIOR BAD ACTS

Lloyd maintains that the trial court abused its discretion when it allowed Officer Cronin to testify that the defendant was the leader of the Unknown Vice Lords, employed security guards from the ranks of his gang, and that he had been the target of two assassination attempts within the previous year. He posits that the evidence received was not sufficiently similar to the crime with which he was charged (possession of a firearm by a felon), and that because of the strong societal bias against members of street gangs, the admission of that testimony was unduly prejudicial. The trial judge admitted the evidence for the limited purposes of establishing "one, the context of the defendant's post-arrest statement, two the relationship between the defendant and other persons in the apartment at the time of the search, and three the defendant's motive to possess a

handgun," as well as why Lloyd felt the necessity to employ armed security guards.

"Under Federal Rule of Evidence 404(b), evidence of other misconduct is not admissible to show that the defendant acted in conformity therewith, but may be admissible for other purposes, *such as proof of motive,* opportunity, intent, preparation, plan, knowledge, or identity." *United States v. Wilson,* 31 F.3d 510, 514 (7th Cir.1994) (citations omitted, emphasis added). "We review the district court's decision to admit the disputed evidence for an abuse of discretion." *Id.* (citations omitted). "The decision to admit evidence will be reversed only when it is clear that the questioned evidence had no bearing upon any of the issues involved at trial." *United States v. Torres,* 977 F.2d 321, 327 (7th Cir.1992) (quotation omitted). The district judge's determination of the admissibility of evidence "is treated with great deference because of the trial judge's first-hand exposure to the witnesses and evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding." *Id.* at 329 (citation omitted).

In determining the admissibility of Rule 404(b) evidence, the court must determine whether (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Wilson,* 31 F.3d at 514–15 (citations omitted, emphasis added).

Under the requirements of *Wilson,* the trial judge determined that Officer Cronin's testimony was (1) directed at establishing a matter other than Lloyd's propensity to commit the crime charged, and was (2) "relevant to the matter in issue," Lloyd's possession of the gun. *Id.* at 514. Information concerning Lloyd's employment of security guards was admitted in evidence not to demonstrate that he had a propensity to possess a gun, but rather, to establish that considering the totality of the circumstances surrounding Williams' and Fisher's relationship to the defendant, vis-a-vis the weapons and their employment status, Lloyd retained constructive possession of the guns they carried while on guard duty. *See* Section III.C., *infra.*

Furthermore, Rule 404(b) specifically states that evidence of prior acts is admissible to establish motive. The assassination attempts on Lloyd provided a possible motive for his possession of the firearms and use of armed guards—protecting his own life, as well as the lives of his girlfriend and child, both of whom were present during the last attempt on his life. Although the defendant argues that motive was not one of the elements the government was required to prove in order to gain a conviction, motive to possess a firearm was "relevant to the matter in issue," *Wilson,* 31 F.3d at 514, because it makes possession "more probable ... than it would be without the evidence." Fed. R.Evid. 403.

The second element of *Wilson* also requires that the acts occur close enough in time to the crime charged to be relevant to the matter in issue. 31 F.3d at 514. The substance of Officer Cronin's testimony concerned the year prior to Lloyd's arrest for the instant offense and this circuit has found that far greater time periods were close enough in proximity to be relevant for purposes of Rule 404(b) analysis. *See, e.g., United States v. Kreiser,* 15 F.3d 635, 640–41 (7th Cir.1994) (seven years before the current charges for conspiring to possess with intent to distribute cocaine, the defendant was involved in a similar cocaine transaction); and *United States v. Goodapple,* 958 F.2d 1402, 1407 (7th Cir.1992) (a defendant charged with possession with intent to distribute valium, obtained and distributed drugs from a hospital in which he worked five years earlier).

The third element of our analysis is also directed at establishing the relevancy of the 404(b) evidence. *See, Huddleston v. United States,* 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988). We have also made it clear that this prong of our

Rule 404(b) *analysis need not be unduly rigid:* we have stated that "when evidence is offered to prove intent, the degree of similarity is relevant only insofar as the acts are sufficiently alike to support an inference of criminal intent.... *The prior acts need not be duplicates of the one for which the defendant is now being tried." United States v. York,* 933 F.2d 1343, 1351 (7th Cir.), *cert. denied,* 502 U.S. 916, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991) (quotations and citations omitted); *see also United States v. Elizondo,* 920 F.2d 1308, 1320 (7th Cir.1990) ("[t]here is no requirement that acts used to show the existence *of a common scheme or plan be identical, just that the charged and uncharged prior events have sufficient points in common.*").

Thus, while the assassination attempts and use of security guards, as recounted by Officer Cronin, were not identical to the crime with which Lloyd was charged, they were nonetheless relevant because they support an inference that Lloyd, aware that his life might be in danger, possessed firearms and made use of armed security guards to protect himself. Furthermore, Cronin's testimony "complete[d] what would otherwise be a ... conceptual void in the story of the crime," *United States v. Spaeni,* 60 F.3d 313, 316 (7th Cir.), *pet. for cert. filed,* No. 95–6386 (Oct. 12, 1995), because Lloyd's statement that his "brothers should have been out there," only becomes clear when it is understood as a reference to his teenaged security guards, Williams and Fisher.

Finally, we turn our attention to balancing the prejudicial and probative value of Officer Cronin's testimony. This court has stated that "[b]ecause evidence of membership in a street gang is likely to be damaging to [a defendant] in the eyes of the jury, district courts must consider carefully the admissibility of such evidence." *United States v. Rodriguez,* 925 F.2d 1049, 1053 (7th Cir.1991) (quotation omitted). The requirement that the probative value of Rule 404(b) evidence must not be substantially outweighed by its prejudicial value "overlaps with Rule 403, which states that 'evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.'" *Torres,* 977 F.2d at 328 (quoting Fed.R.Evid. 403). "Relevant evidence is inherently prejudicial.... Rule 403 was never intended to exclude relevant evidence simply because it is detrimental to one party's case; rather, the relevant inquiry is whether any *unfair prejudice* from the evidence substantially outweighs its probative value." *Cook v. Hoppin,* 783 F.2d 684, 689 (7th Cir.1986) (quotations and citations omitted).

"When balancing the prejudice and probative value, the courts of the various circuits have found the scale tipped in favor of admitting evidence of prior bad acts in cases where the acts involved, or explained, the circumstances of the crime charged, where the acts provided the background for, or development of, the crime charged, and where the acts completed the story of the crime on trial." *United States v. Jordan,* 722 F.2d 353, 356 (7th Cir.1983). "[T]his court has long recognized that gang membership has probative value under appropriate circumstances," *Rodriguez,* 925 F.2d at 1053 (quotation omitted), and has held that "evidence of gang members' lifestyle is admissible when it is intricately related to the facts of [a] case." *Id.* at 1054 (quotation omitted).

Thus, even though the testimony of Officer Cronin aided the prosecution in establishing Lloyd's guilt, our inquiry, as mandated by Fed.R.Evid. 403, is whether the evidence's probative value was outweighed by the risk of *unfair* prejudice. The use of the guards was probative of Lloyd's intent to illegally possess a firearm, as well as assuring that he would have sufficient forewarning if police were approaching. Thus, Officer Cronin's testimony helped to establish Lloyd's actual and constructive possession of the loaded Ruger, *see,* section III. C., *infra,* and the highly probative nature of his testimony outweighs the risk of unfair prejudice to Lloyd. *See Torres,* 977 F.2d at 328.

"Moreover, the district court provided jurors with limiting instructions which restricted their consideration of the evidence." *United States v. Wright,* 943 F.2d 748, 751 (7th Cir.1991) (citation omitted). Before Cronin testified, the trial judge instructed the jury with words to the effect that the evidence you are about to receive can be

considered by you only for the limited purposes of understanding the context of Lloyd's statement "My brothers should have been out there," the relationship of Lloyd to the people in his apartment at the time of his arrest, and his motive to possess a firearm. Furthermore, after the close of evidence, before the jury began their deliberations, the judge once again reiterated the limited purposes of Officer Cronin's testimony, and instructed the jurors that such evidence "cannot be considered by you to show that the defendant had a propensity to commit the crime charged in this case." The court did everything within its power to ensure that the jury focused only on proper uses of Officer Cronin's testimony, rather than using it to establish Lloyd's propensity to possess a firearm. In the context of the evidence presented at trial and the court's limiting instructions, Officer Cronin's testimony was properly admitted for it was probative and not unfairly prejudicial.

## C. POSSESSION OF THE HANDGUN

■■■ In order to convict a defendant of violating 18 U.S.C. § 922(g)(1), the government must demonstrate, beyond a reasonable doubt, each of the following elements: "(1) that the defendant had a previous felony conviction, (2) that the defendant possessed a firearm, and (3) that the firearm had travelled in or affected interstate commerce." *United States v. Moore,* 936 F.2d 1508, 1525 (7th Cir.), *cert. denied,* 502 U.S. 991, 112 S.Ct. 607, 116 L.Ed.2d 630 (1991). Lloyd and the government have stipulated to the elements of prior conviction and that the gun had travelled in interstate commerce; thus, the only issue left for the jury was whether the defendant possessed a firearm.

■■■ During the jury instruction conference, Lloyd's counsel proposed an instruction limiting the jury charge to actual possession of the firearm. The court declined the proposed instruction, ruling, over defense coun-

sel's objection,[5] that it intended to give the prosecution's proposed possession instruction which read:

> Possession may be either actual or constructive. Constructive possession is the ability to control the gun.

> Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.

■■■ On appeal, Lloyd argues that the government failed to establish that he exercised dominion and control over Melita Williams' apartment; thus, there was insufficient evidence to support an inference that he maintained constructive possession of the handgun recovered by Officers Knysch and Rodriguez. The defendant further contends that if the jury's deliberations were limited to actual possession, he would have been acquitted. Our review of jury instructions is governed by the principles that instructions are to be viewed as a whole, and ones "which are accurate statements of the law and which are supported by the record will not be disturbed on appeal." *Doe v. Johnson,* 52 F.3d 1448, 1456 (7th Cir.1995). "Reversal is warranted only if the instruction misguides the jury so much that the litigant is prejudiced." *Maltby v. Winston,* 36 F.3d 548, 560 (7th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995) (quotation omitted).

■■■ "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Moore,* 936 F.2d at 1526 (quoting *United States v. Garrett,* 903 F.2d 1105, 1110 (7th Cir.), *cert. denied,* 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 227 (1990)). We rely on this doc-

---

5. The government asserts that Lloyd's constructive possession argument has been mooted because his counsel tendered an instruction including constructive possession after his actual possession instruction was denied. We disagree with the government's contention for the record on appeal reflects that the instruction was given

over defense objection, and thus, the defendant neither forfeited nor waived his right to appeal this issue. *See, United States v. Lakich,* 23 F.3d 1203, 1207 (7th Cir.1994) ("forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment of a known right").

trine in drug cases as well, in which we have stated that in order to prove constructive possession, "the government must show that the defendant had the ability to exercise control over the contraband, that is, the power to possess the contraband." *United States v. Martinez*, 937 F.2d 299, 305 (7th Cir.1991) (quotation omitted); *see also United States v. Wight*, 968 F.2d 1393, 1398 (1st Cir.1992) (citing *Garrett*, 903 F.2d at 1110) ("as long as a convicted felon knowingly has the power and the intention at a given time of exercising dominion and control over a firearm or over the area in which the weapon is located, directly or through others, he is in possession of the firearm"). "Both actual possession and constructive possession may be proved by direct or circumstantial evidence. It is not necessary that such evidence remove every reasonable hypothesis except that of guilt." *Garrett*, 903 F.2d at 1110.

The evidence received at trial supported the giving of the constructive possession instruction: (1) Lloyd was the leader of the Unknown Vice Lords; (2) he hired two teenaged members of his gang to be his security guards, and they were on duty the night of his arrest; (3) Fitzgerald and Fisher each testified that Williams carried the Ruger as part of his guard duties for Lloyd; (4) Lloyd had dominion and control over the firearm when he taught Fisher how to operate the Ruger just two days before his arrest; (5) although Fisher testified that neither he nor Williams knew where the gun was on the night of the search, Lloyd was well aware of its location as he had placed the Ruger on the shelf after displaying it to the CI; and (6) it is quite obvious that the defendant Lloyd had the intention to exercise control over the guards, as well as their actions, as was evidenced by his use of their services, his instructing Fisher in the operation of the weapon as well as his post-arrest statement that his "brothers should have been out there." These facts serve to establish that although the apartment in which he was arrested may have been leased by Kim Taylor (a/k/a Melita Williams), Lloyd, at the very least, had the power and intention to exercise control over the Ruger therein, which was usually possessed by Williams, one of his teenaged security guards, while on guard duty.

We also reject Lloyd's claim that if the jury had not been instructed on constructive possession, it would have acquitted him of being a felon in possession of a firearm, for in our opinion, the government produced more than sufficient evidence to support a finding that Lloyd was in *actual and constructive* possession of the Ruger: (1) the defendant had the Ruger two days before his arrest when he taught Fisher how to use the gun, as well as on the night before the arrest when he displayed it to the CI; (2) although Williams usually carried the Ruger while on the premises on guard duty, on the night of the arrest Fisher stated that neither he nor Williams knew where it was, but contemporaneously, the firearm was observed in Lloyd's possession in the hall of the apartment and as he was throwing it out the window; (3) Officers Knysch and Rodriguez stated that they witnessed Lloyd throw the gun from the window of the apartment on the night of the arrest; and (4) Lt. Farrell and Sgt. Mingey observed Lloyd with a gun in his hand immediately upon entering the apartment.

According to the transcript, Lloyd obviously had actual possession and control of the Ruger numerous times: when he displayed it to the CI and Fisher and when he placed it back on the shelf in the middle bedroom after exhibiting it; and when four CPD officers saw the Ruger in Lloyd's hand on the night of his apprehension both immediately prior to his arrest and at the time he threw it out the window. Although Renee Fitzgerald attempted to assume the responsibility for possession of the Ruger, testifying that she was the one who threw it out the window, the jury obviously found the law enforcement officers' testimony more credible than Fitzgerald's who obviously was trying to protect her boyfriend and the father of her child from incarceration. We have stated on numerous occasions that we defer to the credibility determinations of the jury because it

> has the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice,

eye contact, posture, and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record. *United States v. Eddy,* 8 F.3d 577, 582–83 (7th Cir.1993), *cert. denied* — U.S. —, 114 S.Ct. 1663, 128 L.Ed.2d 379 (1994) (quotation omitted). We refuse to second-guess their determination.

The jury instruction on actual and constructive possession was a proper statement of the law, as the transcript provides evidence that Lloyd had dominion and control over the weapon whether it was in his own hand or in the hands of his security guards. Thus, we are of the opinion that the trial judge did not commit error when he instructed the jury that they could find the defendant guilty of being a felon in possession of a firearm under a theory of either actual or constructive possession of the weapon.

### D. QUASHED SUBPOENA FOR THE NEWS REPORTER

■■■■ The final issue concerns whether the district court committed error when it quashed the subpoena for Terry Wilson, the *Chicago Tribune* reporter. We review the propriety of quashing a subpoena under the abuse of discretion standard. *United States v. McCollom,* 815 F.2d 1087, 1089 (7th Cir. 1987); *see also United States v. Nixon,* 418 U.S. 683, 702, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974). "An abuse of discretion occurs only when no reasonable person could take the view of the trial court." *United States v. Mounts,* 35 F.3d 1208, 1214 (7th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1366, 131 L.Ed.2d 222 (1995). We afford the trial judge "great deference" on appeal with respect to evidentiary rulings because of his "first-hand exposure to the witnesses and evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding." *Torres,* 977 F.2d at 329.

Lloyd's counsel speculated that Wilson's testimony was crucial to the defense because it may have established that the police officers who investigated his case were so biased against the defendant that they participated in a "lottery," betting upon how much longer he would live. Lloyd's counsel also speculates that because the officers when queried at trial about the alleged lottery denied any knowledge thereof, Wilson's testimony may have *possibly* served as impeachment by prior or inconsistent statement had she interviewed these officers and they acknowledged the existence of the lottery.

■■■■ The issue of the lottery was brought out during the cross-examination of Officers Cronin and Rodriguez, both of whom denied knowledge of its existence. It is well-settled in this Circuit that "a witness may not be impeached by contradiction as to collateral or irrelevant matters elicited on cross-examination." *United States v. Ford,* 21 F.3d 759, 764 (7th Cir.1994) (quotation omitted). Collateral matters are those that are "outside the controversy, or are not directly connected with the principal matter or issue in dispute." Black's Law Dictionary 262 (6th ed. 1990).

Defense counsel has offered nothing more than conjecture and speculation, claiming that Wilson's testimony could have possibly demonstrated that the police were biased against his client, but the existence or nonexistence of the alleged lottery had no relevance regarding the only jury issue at trial: whether Lloyd possessed a firearm. Thus, we agree with the district court's exercise of discretion in ruling that the matter was collateral because it was not directly connected with Lloyd's possession of the Ruger. The defendant's attorney sought to have Wilson's testimony introduced in order to attempt to discredit the testifying officers.

Although Lloyd posits that Wilson's testimony was relevant to demonstrate the "overall bias" of the police department against him, he cites neither evidence nor caselaw in support of the admissibility of what he terms "group bias" evidence concerning the alleged lottery, nor does he relate the alleged bias to any infirmity in his arrest or trial that would require us to reverse his conviction. Furthermore, there is no indication or evidence in the record nor in Lloyd's brief on appeal that he had any specific reason to suspect, much less conclude, that any one of the testi-

fying officers was the alleged person quoted in Wilson's article concerning the lottery, or that any of the officers were providing false information during cross-examination. Lloyd's counsel was engaging in nothing more than an evidentiary fishing expedition because other than the fact that Wilson quoted an "investigator familiar with Lloyd" in her article, no evidence links the investigating officers to the alleged lottery. Lloyd was the leader of a street gang on the west side of Chicago, which had been under police investigation for at least ten years according to Lt. Farrell. There are any number of people in the CPD who are specifically assigned to conduct investigations, such as detectives, but we are well aware of the fact that all law enforcement officers are presumed to have conducted an investigation before making an arrest, unless the crime is committed in their presence. As such, there are likely a number of "investigators" in the CPD who are likely to be "familiar with Lloyd." In fact, Officers Rodriguez and Wiora, who did not generally investigate the Vice Lords, both testified that they knew of the defendant before his arrest in this case from his pictures and by reputation.

Finally, "[t]his court will not reverse a conviction for an evidentiary error if the error was harmless under the standard of Fed.R.Crim.P. 52(a)." *United States v. Santos,* 20 F.3d 280, 286 (7th Cir.1994) (quotations and citations omitted). "A harmful error results only if the error has a substantial and injurious effect or influence on the jury's verdict." *United States v. Schoenborn,* 4 F.3d 1424, 1429 (7th Cir.1993) (quotation omitted).

Thus, even were we of the opinion that the trial court abused its discretion in quashing the subpoena for Wilson, the error would be harmless because we are convinced that in view of the overwhelming evidence of Lloyd's guilt of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), *see,* section III.C, *supra,* even had Wilson testified that one of the officers who testified at Lloyd's trial told her about the lottery, Lloyd would have still been convicted.

We hold that the trial judge did not abuse his discretion when he quashed the subpoena for the news reporter Terry Wilson, because the substance of her proposed testimony was of speculative value at best, and was only being offered for the possible purpose of attempting to impeach witnesses as to matters collateral to Lloyd's possession of the firearm.

AFFIRMED.