IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 19, 2000 Session

## STATE OF TENNESSEE v. CONNIE EASTERLY

**Extraordinary Appeal by Permission from the Circuit Court for Sequatchie County
No. 3879    Robert Steven Bebb, Special Judge**

_____

### No. M2000-00077-CCA-R10-CO - Filed March 1, 2001

_____

In this case, we granted the State's application for extraordinary appeal to determine whether the Sequatchie County Circuit Court erred in denying the State's motion to quash subpoenas issued by the appellee, Connie Easterly, in defense of an indictment charging her with five counts of official misconduct and five counts of forgery. The disputed subpoenas require the attendance and testimony of Michael C. Greene, the Commissioner of the Tennessee Department of Safety, and John Morgan, the Comptroller of the Treasury, at the appellee's trial. Following a thorough review of the record and the parties' briefs, we affirm and modify in part and reverse in part the trial court's order.

**Tenn. R. App. P. 10 Extraordinary Appeal by Permission; Judgment of the Circuit Court is Affirmed and Modified in Part and Reversed in Part.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and JOE G. RILEY, JJ., joined.

Paul G. Summers, Attorney General and Reporter, David M. Himmelreich, Deputy Attorney General, William C. Bright, Assistant Attorney General, and James Michael Taylor, District Attorney General, for the appellant, State of Tennessee.

Charles J. Gearhiser and Sam D. Elliott, Chattanooga, Tennessee, for the appellee, Connie Easterly.

### OPINION

### I. Factual Background

On March 3, 1998, Terry Thomas, an investigator with the Criminal Investigation Division of the Tennessee Department of Safety, discovered that someone had altered title records pertaining to his 1979 Ford truck. Thomas reported the alterations to the Division of Title and Registration of the Department of Safety. Martha Irwin, the Director of the Division of Title and Registration, in turn communicated the complaint to the Division of State Audit of the Office of the Comptroller of the Treasury. The Office of the Comptroller of the Treasury investigated Thomas' complaint and, in February 1999, submitted a "Special Report" to Governor Don Sundquist, the

Tennessee Department of Safety, the Office of the Attorney General and Reporter, and the Office of the District Attorney General for the Twelfth Judicial District.

According to the "Special Report," computer transaction data relating to the title records of Thomas' 1979 Ford truck reflected that, on February 19, 1998, someone had improperly listed the vehicle as stolen and that, on February 28, 1998, someone had altered the record of the vehicle's former license plate number from "LHL382" to "666DVL." Moreover, computer transaction data relating to the title records of a state-owned Chevrolet Blazer assigned to Thomas for use during undercover operations reflected that the owner's name had been changed on March 14, 1998, from Ronald Baker to Arnold Baker and on March 21, 1998, from Arnold Baker to Benedict Arnold. Investigators traced the alterations to the computer identification number and password assigned to the appellee, Connie Easterly, who was then the Sequatchie County Clerk.

The authors of the report conceded that anyone with access to the Tennessee Department of Safety's title and registration computer data base could have acquired the appellee's computer identification number and password, and, therefore, the alterations could not "be tied conclusively" to the appellee. They also noted, however, that the appellee was "the only person with the ability, access, and incentive to improperly change . . . Thomas' title records." This latter conclusion was based, in part, upon a May 22, 1998 interview between Thomas and investigators. During this interview, Thomas stated that, until December 1997, he had been a close friend of the appellee and had also enjoyed a good professional relationship with her. Subsequently, however, Thomas' personal and professional relationship with the appellee deteriorated, and the appellee began engaging in a pattern of "harassing behavior," including leaving copious telephone messages on Thomas' state-assigned pager. Additionally, in January 1998, the appellee threatened to ruin Thomas "personally, professionally, and politically." Due to this threat and an earlier comment by the appellee concerning her ability to alter title records, Thomas reviewed title records pertaining to his 1979 Ford truck, thereby discovering the alterations.

Investigators also interviewed the appellee, who denied altering the title records pertaining to Thomas' vehicles. Moreover, the appellee provided the investigators a list of individuals who knew her computer identification number and password. She further remarked that she was typically the first person to arrive at her office every morning and, therefore, used her computer identification number and password to connect all the computers in her office to the Tennessee Department of Safety's title and registration computer data base. The appellee asserted that, therefore, all title transactions conducted by her staff would be traceable to her computer identification number and password.

The appellee did not initially include Thomas in her list of individuals who knew her computer identification number and password, nor did she otherwise identify Thomas as a suspect. Nevertheless, sometime later during the course of the investigation, the appellee expressed her belief that Thomas had himself altered the title records. The appellee explained that she had previously contacted Art Quarles, Thomas' supervisor, and submitted complaints concerning improper sexual

advances that Thomas had made toward her. According to the appellee, she had successfully requested that Thomas be assigned to another county.

Investigators interviewed the individuals listed by the appellee as knowing her computer identification number and password. These individuals uniformly denied making the illicit alterations to the title records, and some also denied any knowledge of the appellee's computer identification number and password. Similarly, investigators interviewed the appellee's staff, who, contrary to the appellee's assertions, stated that the appellee was typically the last person to arrive at the office and rarely, if ever, used her computer identification number and password to connect the computers in the office to the pertinent data base.

As to Thomas' supervisor, Quarles denied that the appellee had ever submitted a complaint to him concerning improper sexual advances made by Thomas toward the appellee. Rather, Quarles recalled that the appellee had submitted a complaint to him on February 5, 1998, concerning Thomas' confiscation of a vehicle. Upon investigation, Quarles had determined that the confiscation was proper and within the scope of Thomas' job responsibilities. The appellee had additionally submitted a second complaint concerning Thomas' confiscation of another vehicle, and the complaint had again proved to be unfounded. Finally, the appellee had complained to Quarles that Thomas had driven his child to school in a state-owned vehicle. On the occasion of this complaint, Thomas had acknowledged the truth of the appellee's allegation. Accordingly, Quarles had issued a warning to Thomas and reported the incident to Sam Nelson, the Director of the Criminal Investigation Division of the Department of Safety.

Quarles confirmed that Thomas was ultimately transferred to another county. However, Quarles noted that the transfer stemmed from the appellee's apparently vindictive behavior toward Thomas and not from any request by the appellee. Indeed, according to Quarles, the appellee contacted him following the transfer and asked that Thomas be reassigned to Sequatchie County.

On August 18, 1999, following the Comptroller's submission of the "Special Report" to the Office of the District Attorney General for the Twelfth Judicial District, a Sequatchie County Grand Jury indicted the appellee for five counts of official misconduct and five counts of forgery. In defense of the indictment and in preparation for trial, the appellee issued subpoenas requiring the attendance and testimony of Michael C. Greene, the Commissioner of the Department of Safety (hereinafter "the Commissioner"), and John Morgan, the Comptroller of the Treasury (hereinafter "the Comptroller"), at her trial. In response, the State submitted a motion to quash the subpoenas, arguing that the Commissioner and the Comptroller are statutorily exempt from subpoena to trial. Moreover, the State asserted that the appellee had failed to establish that the testimonies of the Commissioner and the Comptroller were either material or relevant to her defense, thereby warranting subpoenas to depositions.

The State attached to its motion affidavits completed by both the Commissioner and the Comptroller. The Commissioner's affidavit stated, in relevant part:

I am currently the Commissioner for the Tennessee Department of Safety . . . . My responsibilities include managing, supervision and pr[e]scribing under the law the guidelines and policies of the Tennessee Department of Safety.

. . . I have met Connie Easterly on a few occasions. To my knowledge, I met with her on April 3, 1995, April 27, 1995, and August 14, 1997. On a few occasions, Ms. Easterly made unscheduled visits to my office. On these occasions our conversation revolved around the general operations of the Division of Title and Registration, its working operations and relation with the various county clerks offices.

. . . I do not have any direct knowledge of the facts or circumstances concerning the allegations contained in the State's case against Ms. Easterly.

. . . My office received three letters from individuals concerning Ms. Easterly which I have attached to my affidavit. I do not personally remember seeing these letters. A member of my support staff sent them to the Criminal Investigation Division and Internal Affairs Division of my office.

Attached to the Commissioner's affidavit were five letters, apparently written by citizens of Sequatchie County and addressed to Governor Sundquist. The letters were received by the Governor's office in April and May of 1998 and immediately forwarded to the Commissioner. The letters essentially expressed appreciation for the appellee's performance of her duties as the Sequatchie County Clerk and expressed concern that the Director of the Division of Title and Registration of the Department of Safety and an investigator with the Criminal Investigation Division were "trying to make this fine clerk look bad."

The Comptroller's affidavit stated in relevant part:
I am currently Comptroller of the Treasury. My responsibilities include managing, supervision and pr[e]scribing under the law the guidelines and policies of the Department of Audit.

. . . To my knowledge, I do not know and have never met Connie Easterly.

. . . I do not have any direct knowledge of the facts or circumstances concerning the allegations contained in the State's case against Ms. Easterly. Upon information and belief, the Division of State Audit did investigate the circumstances concerning this case. This investigation was conducted by Glen McKay, Assistant Director, and

Tommy Sneed, an Audit Investigator. I reviewed a report submitted by them and signed the report as our office's official report concerning these events. I have never talked to Ms. Easterly. The only knowledge that I possess of this case is the information which I reviewed in the report of this incident.

On January 11, 2000, the trial court conducted a hearing on the State's motion to quash the subpoenas of the Commissioner and the Comptroller. At the hearing, the appellee initially clarified that she was willing to take the testimonies of the Commissioner and the Comptroller by deposition. Moreover, the appellee disputed the State's assertion that the testimonies of the Commissioner and the Comptroller were immaterial and irrelevant to her defense. She explained that she expected the Commissioner to testify concerning his office's transmission of the aforementioned letters to the Criminal Investigation Division. According to the appellee, this testimony would be relevant to possible prejudice on the part of Thomas, a principal witness for the State. Additionally, she expected the Commissioner to testify concerning his receipt of a complaint about Martha Irwin, the Director of the Division of Title and Registration, from the appellee and his communication of that complaint to Irwin. The appellee argued that this testimony would be relevant to possible prejudice on the part of Irwin, another witness for the State.[1] As to the Comptroller, the appellee expected him to testify that, following an investigation by his office, the appellee could not be tied conclusively to the illicit alterations to the title records.

At the conclusion of the hearing, the trial court noted that "the issuing of subpoenas in this case and the seeking of depositions go to somewhat of a fishing expedition." Nevertheless, the trial court denied the State's motion. Moreover, the trial court indicated that it would not grant an interlocutory appeal pursuant to Tenn. R. App. P. 9. Accordingly, the State sought an extraordinary appeal in this court pursuant to Tenn. R. App. P. 10. This court granted the State's application on February 3, 2000, to determine whether the Sequatchie County Circuit Court erred in denying the State's motion to quash the subpoenas to trial of the Commissioner and the Comptroller.

## II. Analysis

In reviewing the trial court's decision to enforce the subpoenas to trial of the two state officers, we initially note the appellee's acknowledgment of Tenn. Code Ann. § 24-9-101 (2000), which statutory provision states that "[a]n officer of this state" is "exempt from subpoena to trial but subject to subpoena to a deposition." We further note that there exists no absolute procedural or evidentiary bar to the appellee's use of such depositions at trial.[2] Finally, we note that, as in the trial

---

[1] The State effectively conceded at the hearing that, in fact, the Commissioner had received such a complaint and communicated the complaint to Irwin.

[2] Tenn. R. Crim. P. 15(a) provides that,
> [w]henever due to exceptional circumstances of the case it is in the interest of
> justice that the testimony of a prospective witness of a party be taken and preserved

court, the appellee offers no objection on appeal to taking the state officers' testimonies by deposition. Accordingly, we must conclude that, at a minimum, the trial court erred in failing to modify the subpoenas to require the officers' attendance at depositions.

That having been said, the State also disputes that the officers were subject to subpoenas to depositions. In addressing the propriety of subpoenas to depositions in this case, it is useful to identify the parameters of both a defendant's right to compulsory process and a trial court's authority to control a defendant's utilization of its subpoena power. The Sixth Amendment to the United States Constitution grants an accused a right to compulsory process for obtaining witnesses in her favor. Faretta v. California, 422 U.S. 806, 816, 95 S. Ct. 2525, 2532 (1975). Moreover, because the rights guaranteed by the Sixth Amendment, including the right to compulsory process, "are basic to our adversary system of criminal justice, they are part of the 'due process of law' that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States." Faretta, 422 U.S. at 818, 95 S. Ct. at 2532; see also Washington v. Texas, 388 U.S. 14, 18-19, 87 S. Ct. 1920, 1922-1923 (1967). In Washington, the Supreme Court explained the integral role of a defendant's right to compulsory process in securing justice:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. at 19, 87 S. Ct. at 1923. However, a criminal defendant's right to compulsory process is not absolute; rather, the United States Constitution only prohibits a state from denying a defendant the ability to present testimony that is "'relevant and material, and . . . vital to the defense.'" United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S. Ct. 3440, 3446 (1982)(quoting Washington, 388 U.S. at 16, 87 S. Ct. at 1922)); see also, e.g., United States v. Williamson, 202 F.3d 974, 979 (7th Cir. 2000); United States v. Soape, 169 F.3d 257, 268 (5th Cir.), cert. denied, 527 U.S. 1011, 119 S. Ct. 2353 (1999); Richmond v. Embry, 122 F.3d 866, 872 (10th Cir. 1997); United States v. North, 910 F.2d 843, 889 (D.C. Cir. 1990), withdrawn and superceded in part on other grounds by United States v. North, 920 F.2d 940 (D.C. Cir. 1990).

The Tennessee Constitution similarly affords a defendant facing criminal prosecution the right "to have compulsory process for obtaining witnesses in [her] favor." TENN. CONST. art. I,

---

[2](...continued)
        for use at trial, the court may upon motion of such party and notice to the parties
        order that testimony of such witness be taken by deposition.
Subsection (e) of Rule 15 further indicates that such depositions may be used as substantive evidence at trial if the witness is unavailable in that he is absent from the trial and immune from process. Cf. Tenn. R. Evid. 804(a) & (b).

§ 9. Moreover, like the United States Constitution, our state constitution only extends to a defendant a right to compulsory process

> [i]f a prospective witness is or probably will be a material one . . . . The matter turns on whether the issuance of process would in fact be an abuse of process, and, if the Court finds such is the case the Court has power to prevent such abuse.

Bacon v. State, 385 S.W.2d 107, 109 (Tenn. 1964); see also State v. Smith, 639 S.W.2d 677, 680 (Tenn. Crim. App. 1982)("'[T]he constitutional right to compulsory process requires such process for, and only for, competent, material, and resident witnesses whose expected testimony will be admissible.'").

Our legislature has also created a statutory right to compulsory process that is coextensive with the right guaranteed by our constitution. Tenn. Code Ann. § 40-17-105 (1997) states:

> As provided by the Constitution of Tennessee, the accused, in all criminal prosecutions, has a right . . . to have compulsory process for obtaining witnesses in the accused's favor.

Consistent with this right, Tenn. Code Ann. § 40-17-107(a) (1997) generally directs the clerks of courts in which criminal cases are pending to issue subpoenas "at any time, to any part of the state, for such witnesses as either the district attorney general or the defendant may require." Moreover, Tenn. Code Ann. § 40-17-122 (1997) specifically designates Tenn. R. Crim. P. 17 as the mechanism by which a defendant may realize his constitutional and statutory right to compulsory process.

> Tenn. R. Crim. P. 17 provides:
>
> (a) For Attendance of Witnesses; Form; Issuance. - Every subpoena shall be issued by the clerk or other authorized officer of the court. It shall state the name of the court and the title of the proceeding, and it shall command each person to whom it is directed to attend and give testimony at the time and place and for the party specified therein. The clerk or other authorized officer shall issue a subpoena, or a subpoena for the production of documentary evidence, signed but otherwise in blank to a party requesting it, who shall fill in the blanks before it is served.
>
> (b) Defendants Unable to Pay. - The court shall order at any time that a subpoena be issued for service on a named witness upon an ex parte application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense. . . .
>
> (c) For Production of Documentary Evidence and of Objects. - A subpoena may also command a person to whom it is directed to produce the books, papers, documents, or tangible things designated

therein. The court, upon motion made promptly and in any event by the time specified in the subpoena for compliance therewith, may quash or modify the subpoena if compliance would be unreasonable or oppressive.

In sum, a defendant possesses a constitutional and statutory right to compulsory process when the desired testimony is "'relevant and material, and . . . vital to the defense.'" Valenzuela-Bernal, 458 U.S. at 867, 102 S. Ct. at 3446; see also Bacon, 385 S.W.2d at 109; Tenn. Code Ann. § 40-17-105. However, "a court has the power and the duty to prevent abuse of its process by abating subpoenas for witnesses whose testimony would be immaterial." State v. Womack, 591 S.W.2d 437, 443 (Tenn. App. 1979); see also Bacon, 385 S.W.2d at 109. Obviously, this power and duty extends to proceedings involving all defendants, although Tenn. R. Crim. P. 17(b) places the initial burden of demonstrating materiality upon indigent defendants. Cf. United States v. Moore, 917 F.2d 215, 231 (6th Cir. 1990)(interpreting Fed. R. Crim. P. 17 and observing that "[n]either rich nor poor defendants have an unfettered right to subpoenas without discretionary review by the [trial] court"); United States v. Bennett, 675 F.2d 596, 598 (4th Cir. 1982)(asserting the identical proposition). In the case of non-indigent defendants,

> when a motion is made to quash a subpoena issued at the instance of an accused . . . , the burden is upon the movent to make a prima facie showing by acceptable evidence that the issuance of the subpoena was an abuse of the processes of the court because the witness is
>
> . . . .  without information as to any material issue in the case.
>
> Until abuse of process has been shown [f]actually, there is no ground for quashing a properly issued and executed subpoena.

Womack, 591 S.W.2d at 443-444.

In reviewing a trial court's exercise of its power and duty to prevent the abuse of its process, appellate courts in Tennessee have generally applied an abuse of discretion standard. See, e.g., State v. Burrus, 693 S.W.2d 926, 929 (Tenn. Crim. App. 1985)(finding no abuse of discretion in the trial court's denial of an indigent defendant's motion to subpoena and advance costs for four prospective defense witnesses); Womack, 591 S.W.2d at 446 ("The abuse of the privilege of calling witnesses . . . is familiar to all participants [in our judicial system], and its restraint must depend upon the integrity, common sense and discretion of lawyers and judges all within the bounds of due process."); State v. Quinton Cage, No. 01C01-9605-CC-00179, 1999 WL 30595, at *9 (Tenn. Crim. App. at Nashville, January 26, 1999)(finding no abuse of discretion in trial court's order quashing the defendant's subpoena duces tecum for materials in the possession of the State's DNA expert); State v. Tony Click, No. 162, 1991 WL 188882, at *2 (Tenn. Crim. App. at Knoxville, September 26, 1991)("Where there is no record showing that testimony would have been helpful to [a defendant], there is no abuse of discretion in denying a motion to subpoena defense witnesses."). The application of an abuse of discretion standard by appellate courts is, perhaps, an acknowledgment that the trial court has "'first-hand exposure to the witnesses and evidence as a

whole, and . . . [is] familiar[] with the case and ab[le] to gauge the likely impact of the [proposed testimony] in the context of the entire proceeding.'" United States v. Lloyd, 71 F.3d 1256, 1268 (7th Cir. 1995); but cf. Soape, 169 F.3d at 267 (emphasizing that discretion is afforded only "'within the limits imposed by the Constitution,'" and that the specific question of whether a trial court's refusal to subpoena a witness violates a defendant's right to compulsory process is a question of law, which an appellate court reviews de novo); cf. also Bacon, 385 S.W.2d at 109.

Upon reviewing the record before this court, we conclude that the trial court abused its discretion in denying the State's motion to quash the appellee's subpoena of the Comptroller but correctly denied the State's motion with respect to the Commissioner. In reaching this conclusion, we note our agreement with the observation of the federal district court of the District of Columbia that,

> [i]f the head of a government agency were subject to having his deposition taken concerning any litigation affecting his agency . . . , we would find that the heads of government departments . . . would be spending their time giving depositions and would have no opportunity to perform their functions.

Capitol Vending Co. v. Baker, 36 F.R.D. 45, 46 (D.D.C. 1964). Thus, as a matter of public policy we agree with the State that a trial court should take particular care in ensuring that the proposed testimony of high-ranking government officials subpoenaed by a criminal defendant is or probably will be material to the defendant's case. Cf. United States v. Poindexter, 732 F. Supp. 142, 147 (D.D.C. 1990).

Material testimony consists of "important information directly related to the charges in the indictment and to [the defendant's] anticipated defenses to th[o]se charges." Id. at 149. In other words, "material [testimony] is that which is exculpatory - - evidence that if admitted would create reasonable doubt that did not exist without the evidence." Richmond, 122 F.3d at 872. Generally, such testimony must "comply with established rules of evidence and procedure as required by the state 'to assure both fairness and reliability in the ascertainment of guilt and innocence.'" Id. at 871-872; cf. State v. Brown, 29 S.W.3d 427, 432-436 (Tenn.), cert. denied, __ U.S. __, 121 S. Ct. 275 (2000). Testimony will not be material if merely cumulative or repetitive of other evidence in the case. United States v. Bertoli, 854 F. Supp. 975, 1083-1084 (D. N.J. 1994), vacated in part on other grounds by United States v. Bertoli, 40 F.3d 1384 (3d Cir. 1994).

As conceded by the appellee at the January 11, 2000 hearing, the sole testimony that the Comptroller could proffer at a deposition would comprise his confirmation that he had read and approved the "Special Report" prepared by Glen McKay, the Assistant Director of the Division of State Audit, and Tommy Sneed, an Audit Investigator, and that the report indicated that the alterations to Thomas' vehicle title records could not be "tied conclusively" to the appellee. The State noted at the hearing that both McKay and Sneed had been subpoenaed to testify at the appellee's trial. Accordingly, assuming that the Comptroller's testimony would be otherwise material and admissible at the appellee's trial, the testimony would be purely cumulative, and the subpoena to deposition of the Comptroller is an abuse of process.

As to the Commissioner, testimony concerning possible bias or prejudice on the part of key State witnesses may, indeed, constitute "material" testimony, i.e., "evidence that if admitted would create reasonable doubt that did not exist without the evidence." Richmond, 122 F.3d at 872; cf. State v. Caughron, 855 S.W.2d 526, 547-548 (Tenn. 1993)(observing that, in the distinct context of a violation of the rule announced in Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), evidence impeaching a government witness' credibility may be material). Moreover, Tenn. R. Evid. 616 permits a party to "offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." In this case, however, it is unclear to this court how the transmission by the Commissioner's office to the Criminal Investigation Division of letters written by various citizens of Sequatchie County and addressed to the Governor would prejudice Thomas against the appellee. Even assuming that Thomas read the letters at issue, the letters merely commended the appellee for her performance of her duties as the Sequatchie County Clerk and expressed concern about, and disbelief of, any accusations made by both Thomas and Irwin.

Nevertheless, the Commissioner's communication to Irwin of a complaint made by the appellee concerning Irwin's job performance could certainly have inspired prejudice on the part of Irwin. Moreover, as noted earlier, the record indicates that Irwin first requested the investigation by the Division of State Audit of the alterations to Thomas' vehicle title records. The record also suggests that Irwin would testify at the appellee's trial concerning the appellee's access to computer transaction codes necessary to make the illicit alterations. The State did not indicate at the January 11, 2000 hearing whether or not Irwin could testify concerning the Commissioner's communication to her of the complaint at issue. Finally, contrary to the State's argument on appeal, the Commissioner's testimony concerning his communication of the complaint to Irwin would not constitute hearsay, as the appellee would be proffering the testimony in order to demonstrate the effect of the communication upon Irwin, regardless of the truth of the communication or the truth of the complaint. Tenn. R. Evid. 801(c). Accordingly, the record fails to establish that a subpoena to deposition of the Commissioner would constitute an abuse of process.

### III.  Conclusion

For the foregoing reasons, we affirm the order of the trial court denying the State's motion with respect to the Commissioner and modify the order to require the Commissioner's attendance at a deposition. However, we reverse the order of the trial court denying the State's motion to quash the subpoena of the Comptroller.

NORMA McGEE OGLE, JUDGE