UNITED STATES of America,
Plaintiff–Appellee,

v.

Tommy ASHER, Defendant–Appellant.

No. 98–1700.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 9, 1999.

Decided May 21, 1999.

Charles Goodloe, Jr. (argued), Judith A. Stewart, Office of the United States Attor-

ney, Indianapolis, IN, for Plaintiff–Appel-lee.

William E. Marsh (argued), Indiana Federal Community Defenders, Inc., Indianapolis, IN, for Defendant–Appellant.

Before CUDAHY, RIPPLE and DIANE P. WOOD, Circuit Judges.

RIPPLE, Circuit Judge.

On July 14, 1997, a jury found Tommy Asher[1] guilty of switching the Vehicle Identification Number ("VIN") from a wrecked red and black 1992 GMC Jimmy to a stolen blue and khaki 1992 Chevrolet Blazer,[2] operating a chop shop,[3] possessing a motor vehicle with an altered VIN,[4] and transporting a stolen vehicle across state lines.[5] Judgment was imposed on March 12, 1998, and Mr. Asher was sentenced to 84 months of imprisonment followed by 3 years of supervised release and was assessed $250 and fined $70,000. Mr. Asher appeals his conviction, claiming that the district court abused its discretion by admitting evidence at trial of his prior bad acts under Federal Rule of Evidence 404(b) and by denying Mr. Asher's Motion for a New Trial based on a lack of materiality. Upon review of the record and consideration of the arguments of counsel on each issue, we affirm the judgment of conviction.

# I

## BACKGROUND

### A. Facts

■ This case centers around Tommy Asher's involvement with a vehicle labeled "vehicle 111" by federal agents. It requires a tortuous route through the record to show Mr. Asher's relationship to vehicle 111. As the reader will see, there is a shadowy history in these facts, one that the jury needed to assess. The facts, taken in the light most favorable to the government,[6] show that Mr. Asher was involved with the alteration of a stolen vehicle that became vehicle 111. Mr. Asher's link to vehicle 111 must be considered in determining the appropriateness of the Rule 404(b) evidence in this case.

On January 26, 1993, Mr. Asher and his son, James Asher, purchased a wrecked salvage red and black 1992 GMC Jimmy from G.W. Pierce Auto Parts. A check to G.W. Pierce Auto Parts for $4,200, drawn on an FAS Auto Sales account, paid for the Jimmy, and Mr. Asher took possession of the vehicle. Although there is a dispute concerning Mr. Asher's operation of FAS Auto Parts, there is no dispute that Mr. Asher negotiated for the purchase of the Jimmy; Mr. Asher admits that he may have written the check, but that James Asher would have signed the check. G.W. Pierce Auto Parts had purchased the Jimmy from Meridian Insurance Company, which had obtained an Indiana Salvage Certificate of Title after it had acquired the totaled vehicle from its insured. Following Mr. Asher's purchase of the Jimmy, G.W. Pierce Auto Parts secured and retained an Ohio salvage title to the Jimmy, and thus Mr. Asher's name was kept out of the chain of title.

On February 4, 1993, Ricky Cantrell and Dion Staten stole a blue and khaki 1992

---

1. Mr. Asher was one of 25 defendants charged in a 43–count, 95–page indictment returned by a grand jury on September 14, 1995. Mr. Asher, along with 15 other defendants, was initially charged in count one with vehicle theft conspiracy and other substantive crimes relating to the theft of vehicle 111. The district court dismissed count one based on Mr. Asher's 1990 conviction for being a member of the conspiracy charged in count one.

2. *See* 18 U.S.C. § 511.

3. *See* 18 U.S.C. § 2322.

4. *See* 18 U.S.C. § 2321.

5. *See* 18 U.S.C. § 2312.

6. On appeal the facts are drawn from the record and are viewed in the light most favorable to the government. *See United States v. Holt,* 170 F.3d 698, 700 (7th Cir.1999); *United States v. Wingate,* 128 F.3d 1157, 1158 (7th Cir.1997).

Chevrolet Blazer from Stanley King. The two men disassembled the Blazer in Cantrell's garage where he ran his chop shop.[7] Cantrell and Staten removed the transmission and engine from the Blazer, and Cantrell, Staten, and David Sloan loaded parts of the body of the Blazer into a rental truck. Staten then delivered and sold parts of the body of the Blazer to Mr. Asher in Greenwood, Indiana.

At this point, the assembly of a hybrid sports utility vehicle, later labeled vehicle 111, began. Mr. Asher had the body of the stolen Blazer assembled onto the running gear of the wrecked Jimmy, and the Blazer body was painted to resemble the red and black Jimmy. The VIN from the Jimmy was affixed to the dash of this hybrid vehicle and thus the VIN matched the frame, engine, and transmission numbers. This transformation, maintains the government, took place at Mr. Asher's residence and at Griffin's Auto Body. The new hybrid vehicle, vehicle 111, is at the center of this case.[8]

On June 18, 1993, Mr. Asher instructed his son, James Asher, to present the hybrid vehicle for a salvage inspection at the Ohio State Highway Patrol Inspection Station. The vehicle was presented for inspection on behalf of G.W. Pierce Auto Parts. The inspection was terminated when the inspection team found suspicious defects in the vehicle. The inspection team discovered that the vehicle did not have the required federal identification decal on the door post, and James Asher was unable to provide parts invoices for the allegedly repaired door post. Following the inspection, Mr. Asher telephoned Trooper Simms at the Inspection Station to find out what the problem had been during the inspection.

Mr. Asher then instructed James Asher and Jeannie Berkowitz to return for a second inspection and to sign an Ohio

State Highway Patrol Vehicle Identification Inspection Form to acquire clean title to the hybrid vehicle. On June 23, 1993, Berkowitz, Mr. Asher's sister-in-law, presented the vehicle at another Ohio Inspection Station armed with bogus parts invoices to substantiate the repairs. The inspection team determined that the vehicle was stolen and impounded the vehicle.

There was substantial evidence presented at trial that the hybrid vehicle was comprised of the salvage Jimmy and the stolen Blazer. After the hybrid vehicle was impounded, examination by the authorities revealed that under the repainted red and black paint there was blue paint. The vehicle did not have the required federal identification decal on the door post and there was no evidence that the door post had been replaced, as Mr. Asher claimed. Furthermore, the hybrid vehicle revealed repairs to the right rear of the body, repairs consistent with the repairs that Stanley King had performed on his Blazer prior to its theft. In addition, the date stamp on the doors and the SPID label in the glove box of the vehicle were consistent with the manufacture of the Blazer rather than the Jimmy. There was also evidence that someone had tampered with the VIN on the dashboard of the hybrid vehicle, and the original manufacturer's identification number on the body of the hybrid vehicle matched the VIN of the stolen Blazer rather than the salvage Jimmy.

After vehicle 111 was impounded, Mr. Asher traveled to Ohio and attempted to gain return of his hybrid vehicle. Mr. Asher asked Dean Griffin to come along with him to Ohio to provide any necessary testimony regarding the repairs to the vehicle. Mr. Asher also telephoned Sergeant Monte McGowen and threatened him with

---

7. Mr. Asher's attorney acknowledged that the government proved that Cantrell was operating a chop shop.

8. This hybrid vehicle was labeled vehicle 111 by federal agents in the course of their investigation covering 10 years and involving hundreds of vehicles.

a lawsuit if his vehicle was not returned to him.

Mr. Asher maintains that vehicle 111 was actually the Jimmy and was legitimately repaired with parts purchased from Hubler Chevrolet and G.W. Pierce Auto Parts. Mr. Asher testified to the grand jury that he did some of the unbolting of the damaged parts of the Jimmy and performed some of the bolt-on work at his residence on County Line Road. Mr. Asher then sent the more detailed repair work on the Jimmy to Mr. Griffin. Mr. Asher testified to the grand jury that he had the body work done at Griffin's Auto Body and had the frame work done at Autorama.

Mr. Asher provided invoices to the grand jury in an attempt to support his story. The invoices that Mr. Asher provided to the grand jury were shown to be false,[9] and the invoices failed to document Mr. Asher's version of the repair and reconstruction of the Jimmy.[10]

## B. Proceedings in the District Court

The government initially proffered prior act evidence involving 49 other vehicles under Federal Rule of Evidence 404(b). Pursuant to supplemental proffers by the government, this number was reduced to 26. Thereafter, the district court admitted evidence at trial regarding Mr. Asher's uncharged criminal conduct involving 13 cars during the 1980s.[11] The district court required that the government prove its prima facie case on the charged crimes before the court permitted any Rule 404(b) evidence. The district court determined that the Rule 404(b) evidence was probative of Mr. Asher's motive for purchasing a salvage vehicle, showed Mr. Asher's intent

to seek financial gain, demonstrated Mr. Asher's knowledge and absence of mistake, and showed Mr. Asher's distinctive method of operation. The court also concluded that the probative value of the evidence outweighed any potential unfair prejudice to Mr. Asher. Furthermore, the court twice gave limiting instructions to the jury to ensure that the jury properly used the prior bad acts evidence, and the court reserved the right to reassess the evidence should the evidence become cumulative, a waste of time, or confusing to the jury or should the probative value of any of the evidence be outweighed by unfair prejudice.

Also at trial, David Sloan testified that Cantrell[12] had told Sloan that Cantrell and Dion Staten had stolen a blue and khaki Blazer and sold part of the body of the Blazer to a former race car driver in Greenwood who lived one-half mile from a church.[13] The government possessed copies of written summaries of three interviews conducted by the FBI with Cantrell. In the FBI interviews, Cantrell stated that the Blazer was not stolen "on order" for Mr. Asher, that the stolen Blazer was gray rather than blue, and that Cantrell had stolen the Blazer with Sloan, rather than with Staten. Mr. Asher did not request and the government did not provide copies of these summaries to Mr. Asher prior to trial. Mr. Asher was not informed by the government that Cantrell had made these statements.

Following the trial, Mr. Asher requested copies of these statements in preparation for sentencing, and the government complied with this request. Mr. Asher then

---

9. Dates and check numbers failed to match; invoices were determined to be bogus; invoices were produced from voided invoices; and handwriting and signatures were forged.

10. The parts listed on the invoices did not correspond with the purported repairs.

11. The government was prohibited from offering any evidence of Mr. Asher's prior conviction for vehicle theft conspiracy.

12. Cantrell was deceased at the time of trial. Cantrell's out-of-court statement was admitted pursuant to Federal Rule of Evidence 801(d)(2)(E).

13. Mr. Asher is a former race car driver in Greenwood. Detective Mark Hess testified that Mr. Asher lives one-half mile from a church in Greenwood.

filed a motion for a new trial based on *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), alleging that the interview statements contained information favorable to Mr. Asher. The district court denied the motion for a new trial on the grounds that the withheld evidence was immaterial and was consistent with the other evidence in most material respects.

Mr. Asher now raises two issues on appeal. Mr. Asher asserts that the district court abused its discretion by allowing the jury to hear evidence of Mr. Asher's prior involvement with 13 vehicles during the 1980s, and that the district court abused its discretion when it determined that the undisclosed summaries of interviews conducted by the FBI with Cantrell were immaterial and consistent with the other evidence.

## II

## DISCUSSION

### A. Prior Bad Acts Evidence Admitted Under 404(b)

█ Mr. Asher contends that he was denied a fair trial because the government was permitted to offer prior bad acts evidence that did not satisfy Federal Rule of Evidence 404(b).[14] Mr. Asher argues that the district court merely conducted a superficial review and a cursory analysis of the government's proffered evidence regarding Mr. Asher's involvement in a series of automobile thefts during the 1980s. Mr. Asher further contends that the district court recited boilerplate Rule 404(b) law without sufficient foundation for its determination and that the district court

failed to articulate the purpose for the evidence, the similarity of the evidence to the charges, the temporal proximity of the prior acts, the sufficiency of the evidence, or the weight of the probative value of the evidence. Finally, Mr. Asher asserts that the district court failed to cure its error with its jury instructions.

Although Mr. Asher concedes that it was within the discretion of the district court to admit some of the evidence,[15] Mr. Asher argues that the admission of most of the evidence constituted an abuse of discretion. Mr. Asher contends that the government was permitted to "flood the courtroom" with prior bad acts evidence, the admission of which was an impermissible attack on his character leading the jury to convict him based on his being a "thoroughly bad sort."

The government responds that the district court properly found the prior bad acts evidence admissible for a purpose other than to prove Mr. Asher's character and that the probative value of the evidence outweighed any potential unfair prejudice to Mr. Asher. Because Mr. Asher attempted to cast doubt regarding his involvement in any illegal activity relating to the stolen Blazer, the government sought to shed light on Mr. Asher's state of mind and sought to place Mr. Asher's conduct in context. The government argues that, even if Mr. Asher's involvement may have been explainable in isolation, his experience in these types of transactions permitted reasonable inferences revealing motive, intent, knowledge, and modus operandi.

█ We review a district court's decision to admit evidence under Federal Rule

---

**14.** Rule 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a

criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial. Fed.R.Evid. 404(b).

**15.** *See* Appellant's Br. at 9. Mr. Asher does not state which evidence was properly admitted.

of Evidence 404(b) for an abuse of discretion. *See United States v. Moore,* 115 F.3d 1348, 1354 (7th Cir.1997); *United States v. Lloyd,* 71 F.3d 1256, 1264 (7th Cir.1995), *cert. denied,* 517 U.S. 1249, 116 S.Ct. 2511, 135 L.Ed.2d 200 (1996). We may reverse a district court's decision to admit evidence when it is clear that·the questioned evidence had no bearing on any of the issues involved in the trial. *See Lloyd,* 71 F.3d at 1264. An appellate court will not second-guess the decision of the district court when that decision was made in conformity with established legal principles. *See United States v. Prevatte,* 16 F.3d 767, 774 (7th Cir.1994).

■ The Seventh Circuit has combined the requirements of Rule 404(b) and Rule 403 to create a four-prong test that governs the admission of prior bad acts evidence. *See United States v. Smith,* 103 F.3d 600, 603 (7th Cir.1996). The admissibility of evidence under Rule 404(b) is governed by this well-established four-part test. *See United States v. Brooks,* 125 F.3d 484, 499–500 (7th Cir.1997); *United States v. Koen,* 982 F.2d 1101, 1116 (7th Cir.1992). Evidence of prior crimes, wrongs, or acts may be admitted when: (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *See United States v. Lewis,* 110 F.3d 417, 420 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997); *Brooks,* 125 F.3d at

499–500; *Prevatte,* 16 F.3d at 774; *Koen,* 982 F.2d at 1116.

The district court carefully assessed the evidence and determined that the evidence met the four-prong test as set forth in *Prevatte.* The district court took great care to analyze each piece of proffered evidence under each prong of the four-prong test and clearly articulated its reasoning for admitting certain evidence and refusing other evidence. The district court held a hearing on July 2, 1997, during which it overruled Mr. Asher's objections with respect to vehicles 12, 14, 23, 24, 26, 33, 36, 37, 42, 51, 59, 61, and 67, and sustained his objections regarding vehicles 7, 16, 30, 32, 49, 50, 53, 54, 64, 65, 66, 71, and 72.

First, the district court explained that all 26 vehicles met the time frame requirement because of the context of the charge and the manner in which the events occurred related to vehicle 111, the Jimmy–Blazer hybrid. The district court explained in its Entry that there are "no uniform answers as to how proximate the prior acts must be to the charged acts"; however, "[g]iven the context of the offenses charged and the prior acts, the court finds that the intervening time period is not too remote." R.246 at 6.[16] Next, the district court stated that for any Rule 404(b) evidence to be admitted, it must be clear from the evidence that Mr. Asher had direct involvement with the transactions related to the particular vehicle. Thus, the district court continued by assessing each vehicle individually.

Vehicles 33 and 61 each were connected to Mr. Asher and involved the use of bogus receipts to support a restoration affidavit. The court stated that evidence regarding vehicles 33 and 61 could be used to show

---

**16.** The district court stated that the prior acts were committed 3 to 8 years prior to the charged act. It supported its determination by citing to *United States v. Harrod,* 856 F.2d 996, 1002 (7th Cir.1988), and comparing *United States v. DeCastris,* 798 F.2d 261, 265 (7th Cir.1986) (ten years before the crime

charged is not too long), and *United States v. Chaimson,* 760 F.2d 798, 807 (7th Cir.1985) (similar act committed five years before charged acts sufficiently related in time), with *United States v. Jimenez,* 613 F.2d 1373, 1376 (5th Cir.1980) (one year after the crime charged is too long).

knowledge, motive, intent, or absence of mistake. Furthermore, the court determined that vehicles 33 and 61 went to an issue in the case because the use of the bogus receipts was so similar to the use of the receipts with vehicle 111.

With respect to vehicle 12, the court explained that Thomas Spegal was expected to testify that he had stolen the vehicle for Mr. Asher, and that a salvage vehicle purchased by Mr. Asher from G.W. Pierce was used to renumber the stolen vehicle. Title was obtained using bogus receipts on advice from Mr. Asher. Mr. Asher kept his name out of the chain of title and sold the vehicle to a purchaser.

Vehicles 23, 26, and 51 were all driven by Mr. Asher for inspection. The court determined that evidence regarding the vehicles would go to show knowledge, motive, intent, and absence of mistake, and that Mr. Asher's dealings with the vehicles had many similar characteristics to his dealings with vehicle 111. Furthermore, the court stated that the evidence would be probative and not unduly prejudicial.

Regarding vehicle 24, Mr. Asher's involvement was also direct. The vehicle was purchased from Mr. Asher and was ultimately impounded in Florida. The vehicle had been stolen for Mr. Asher, a salvage vehicle was purchased by Mr. Asher through G.W. Pierce, and the ultimate sale kept Mr. Asher's name out of the chain of title. The court stated that such evidence went toward showing knowledge, motive, intent, and absence of mistake.

Vehicles 36 and 37 were stolen by Spegal and delivered to Mr. Asher within days of their theft. Title was obtained using false receipts pursuant to Mr. Asher's instructions. Vehicles 36 and 37 were determined to be admissible on the matters of knowledge, motive, intent, and absence of mistake. Furthermore, the district court noted that the accumulation of evidence of this type had not reached a level that would cause unfair prejudice.

Regarding vehicles 42 and 67, Mr. Asher had had discussions with law enforcement about those vehicles that were similar to the discussion about vehicle 111. The district court permitted evidence on vehicles 42 and 67 after the court determined that the evidence was substantially similar and was probative of knowledge and intent, as well as potentially probative of motive and absence of mistake.

Vehicle 59 was sold by Mr. Asher to Draper Auto Sales. The government's proffer showed that Mr. Asher had instructed the processing of a restoration affidavit for vehicle 59 by using false back-up documents. James Asher ultimately processed the paperwork. The court stated that the fact that the paperwork and vehicle went from Tommy Asher to James Asher produced probative evidence on knowledge, intent, and absence of mistake relative to vehicle 111, and that the similarity was evident.

Following the hearing on the proffered Rule 404(b) evidence, on July 7, 1997, the district court issued its evidentiary ruling. *See* R.246. The Entry summarized the results of the hearing and elaborated on the court's determinations. The district court again applied the four-part Rule 404(b) test to the vehicles. First, the court explained that the government was required to show that the acts surrounding the vehicles were being offered to establish a matter in issue as opposed to propensity to commit the crime. The court determined that knowledge, motive, plan (i.e., modus operandi), identity, intent, and absence of mistake were permissible matters under Rule 404(b). The court provided an example that some of the vehicles illustrated that Mr. Asher's motive for buying salvage vehicles was not to rebuild them but rather to aid him in retitling stolen vehicles to make them appear to be legitimate. Other vehicles showed his intent to seek financial gain and his unique modus operandi. Mr. Asher's actions with respect to some of the vehicles clearly showed his knowledge and absence of mistake with regard to, among

other things, titling practices, proper salvage operations, disguising cars, theft of motor vehicles, the use of "cover" VINs and titles to conceal the stolen nature of vehicles, and using others to keep his name out of the chain of title.

Second, the court discussed the substantial similarity and temporal proximity between the proffered vehicles and vehicle 111. Considering the context of the events and the distinctive similarities such as the bogus receipts, the court determined that the second prong was satisfied. Third, the court stated that enough evidence had been adduced to support a jury finding that Mr. Asher had committed the proffered bad acts.

Finally, the court explained that the probative value of the thirteen admitted vehicles was not outweighed by any danger of unfair prejudice. Each vehicle established a matter in issue and had great similarity to the activities surrounding vehicle 111. Further, the vehicles helped to give a "more complete picture of Asher's nefarious activities." R.246 at 8 (citing *United States v. Spaeni*, 60 F.3d 313, 316 (7th Cir.) (prior uncharged acts admissible to fill in gaps and provide background), *cert. denied*, 516 U.S. 997, 116 S.Ct. 536, 133 L.Ed.2d 441 (1995)).

In this Entry, the district court also outlined the safeguards it would impose to protect Mr. Asher by requiring that the government prove its prima facie case with respect to vehicle 111 before the court would entertain any of the prior bad acts evidence under Rule 404(b). The district court stated that

> an appropriate limitation on the use of the evidence of uncharged prior acts will be necessary to ensure that Asher is judged, not by propensity of character but by evidence of the crimes charged. Accordingly, at appropriate times during the trial, and in the final instruction at the close of the case, the relevance and appropriate use of evidence of uncharged acts will be safeguarded by the giving of a limiting instruction.... [17]

R.246 at 9.

In reviewing the district court's determination of the admissibility of this evidence, we must accord great deference to the district court's assessments because of the judge's first-hand exposure to the evidence and because of the judge's familiarity with the case and ability to gauge the impact of evidence in the context of the proceeding. *See United States v. Lloyd*, 71 F.3d 1256, 1264 (7th Cir.1995), *cert. denied*, 517 U.S. 1249, 116 S.Ct. 2511, 135 L.Ed.2d 200 (1996).

The admitted Rule 404(b) evidence certainly had a bearing on the issues involved in the trial because Mr. Asher defended his charge by arguing that his transactions for salvage vehicles with G.W. Pierce Auto Parts were normal business

---

17. The form of the limiting instruction in the Entry was as follows:

> You have heard evidence about acts of the Defendant related to matters other than the acts alleged in the Indictment. You may consider this evidence only on the questions of motive, identity or plan, or whether any acts of this Defendant alleged in the Indictment, if proven, were done with knowledge, intent, absence of mistake, or were not inadvertent acts. This evidence on other matters is to be considered by you only for this limited purpose. The evidence on these other matters is not evidence that the Defendant committed the acts alleged in the Indictment at the times alleged, nor is it evidence that it is more likely that he did commit those acts charged because of the occurrence of these other matters. The government must prove the Defendant's participation in the acts alleged in the Indictment beyond a reasonable doubt from other evidence. The evidence on these other matters is admitted only for the limited purpose stated above, and cannot be considered for any other purpose.
>
> Keep in mind that the Defendant is not charged with these other acts—he is charged with the allegations contained in the Indictment only. The Defendant is not on trial for any conduct or criminal offenses not charged in this Indictment. Accordingly, you may not convict the Defendant for any conduct or criminal offenses which are not charged in the Indictment. R.246 at 9.

transactions and that Mr. Asher had no intent to use the salvage vehicle to obtain a VIN for a stolen vehicle. *See generally United States v. Schweihs*, 971 F.2d 1302, 1312–13 (7th Cir.1992) (holding that it was not an abuse of discretion for the court to admit Rule 404(b) evidence to show intent and knowledge when such issues were likely in dispute). Mr. Asher's prior involvement in a theft ring with distinctive similarities to the transformation of the stolen Blazer is relevant in assessing his knowledge, motive, intent, and absence of mistake when attempting to discern his involvement with vehicle 111. *See United States v. Smith*, 103 F.3d 600, 603 (7th Cir.1996) (explaining that modus operandi evidence must be sufficiently idiosyncratic to permit an inference of a pattern). It is appropriate for a court to admit evidence of prior bad acts in cases in which the acts involve or explain the circumstances of the crime charged, the acts provide the background for or development of the crime charged, or the acts complete the story of the crime charged. *See Lloyd*, 71 F.3d at 1265.

Furthermore, the district court held an evidentiary hearing on this matter, properly applied the four-part standard, prohibited the introduction of prior conviction evidence that it determined to be too prejudicial, required that the government present its prima facie case prior to its introduction of Rule 404(b) evidence, limited the government's introduction of Rule 404(b) evidence to 13 cars rather than the 26 that the government requested to offer, reserved the right to reassess the evidence, gave limiting instructions prior to the introduction of the evidence, and gave a final instruction to the jury to remind the jury of its restricted use of the evidence. Limiting instructions have been held to be sufficient to cure potential prejudice resulting from the admission of Rule 404(b) evidence. *See United States v. Brooks*, 125 F.3d 484, 500 (7th Cir.1997) (citing *United States v. Moore*, 115 F.3d 1348, 1355 (7th Cir.1997); and *United States v. Rivera*, 6 F.3d 431, 444 (7th Cir.1993), *cert. denied*, 510 U.S. 1130, 114 S.Ct. 1098, 127 L.Ed.2d 411 (1994)). Thus, the district court appears to have provided every safeguard within its power to ensure that the evidence was properly admitted and that the jury considered the evidence appropriately. *See Lloyd*, 71 F.3d at 1266. Because the district court properly weighed the Rule 404(b) factors and observed numerous safeguards to reduce the possibility of unfair prejudice, we conclude that there was no abuse of discretion in the district court's admission of the Rule 404(b) evidence.

## B. Materiality of Undisclosed Information

■ Mr. Asher contends that the government withheld information that was material to the issues at trial in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which held that the government's suppression of evidence favorable to an accused violates due process when the evidence is material. As explained above, Cantrell had given three statements to the FBI that were not disclosed to Mr. Asher until after the trial. In his initial statements, Cantrell told the FBI that he had stolen a gray Blazer, rather than a blue Blazer, and that Staten delivered parts of the Blazer to a former race car driver in Greenwood. In Cantrell's statement on May 16, 1994, after Mr. Asher was under investigation, Cantrell told the FBI that he and Sloan had stolen the blue Blazer, but that they had not stolen the Blazer "on order" for Mr. Asher. During trial, Sloan testified that Cantrell, who was deceased at the time of the trial, had explained to Sloan that Cantrell and Staten had stolen a blue and khaki Blazer and sold part of the body to a former race car driver in Greenwood.

Mr. Asher argues that the FBI summaries contradict Cantrell's statements as relayed by Sloan, rebut one of the government's themes, and contradict the credibility of Sloan as a witness. Mr. Asher asserts that the district court failed to focus

its determination of materiality on the fairness of the trial and instead relied on the fact that the "evidence against Defendant at trial was overwhelming." R.282 at 13.

The government responds that the district court properly found that the newly discovered statements were in all material respects consistent with the other evidence in the case and that the disclosure of the additional three statements would not have changed the result in the trial. Furthermore, the government contends that the additional evidence was inconsequential to the trial and would have been inadmissible.

 We review for abuse of discretion a district court's denial of a motion for a new trial based on newly discovered evidence claimed to violate *Brady*. *See United States v. Silva*, 71 F.3d 667, 670 (7th Cir.1995). To be entitled to a new trial as a result of a *Brady* violation, the defendant must establish that: (1) the prosecution suppressed the evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the case. *See United States v. Hartbarger*, 148 F.3d 777, 786 (7th Cir.1998), *cert. denied*, — U.S. ——, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999); *Silva*, 71 F.3d at 670. The test for materiality of the evidence under *Brady* is whether, in the absence of the evidence, the defendant received a fair trial resulting in a verdict worthy of confidence. *See Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

The district court denied Mr. Asher's motion for a new trial after applying the proper three-part test of Silva. The district court determined that, even though evidence that was presumably favorable had been withheld, the evidence was not material, and thus denied Mr. Asher's motion for a new trial. As explained by the district court, in light of the evidence adduced at trial, the inconsistencies between Cantrell's statements to the FBI and his statement admitted at trial pursuant to Rule 801(d)(2)(E) do not undermine confidence in the trial. Further, it is improbable that any impeachment value of the statements would have affected the credibility of the witnesses such that the verdict would have been different.

We conclude that the addition of the suppressed evidence would not have "put the whole case in such a different light as to undermine confidence in the verdict." *See Kyles*, 514 U.S. at 435, 115 S.Ct. 1555. Therefore, the district court properly held that there was no "reasonable probability" that the disclosure of the suppressed information would have affected the outcome of the trial. *See id.* at 434, 115 S.Ct. 1555.

## Conclusion

Based on the foregoing, we hold that the district court did not abuse its discretion in admitting the Rule 404(b) evidence; nor did it abuse its discretion by denying Mr. Asher's Motion for a New Trial because the suppressed evidence failed to undermine confidence in the outcome of the trial. Thus, the judgment of conviction of Mr. Asher is affirmed.

AFFIRMED

CUDAHY, Circuit Judge, concurring.

The district court carefully examined all the government evidence of "bad acts" involving 13 uncharged vehicles, presented through 20 witnesses and more than 100 exhibits. This evidence was intended to paint a "more complete picture" of Asher's alleged criminal designs in processing a single car and it occupied the second half of the trial. The crimes charged related only to vehicle 111, though, and the "prima facie" evidence of these crimes occupied the first half of the trial only.[1] Originally, the evidence of the other vehicles had been intended to support conspiracy charges which were dismissed on double jeopardy grounds at the outset of the trial. The defendant, of course, complains that he is

---

1. The district court's use of the term "prima facie" in the criminal context confounds me.

As best I can figure, the district court intended "prima facie case" to mean enough

in effect being tried for conspiracy even though the conspiracy charge was thrown out. The government, red-faced, responds that Asher was involved in a "continuing crime even though [he] was not on trial for conspiracy." Appellee's Br. at 14.

This case seems to present a special case of Rule 404(b), where the "bad acts" testimony arguably touches upon almost all of the approved bases for admission of this kind of evidence—knowledge, intent, motive, plan, etc.—but essentially provides a context within which Asher's conduct can be more reliably characterized. However, the district court's wholesale invocation of all the possible grounds for admission blurs important lines among them. There is a difference, for example, between evidence that might show that Asher knew how to process cars (knowledge) and evidence that might show that Asher processed each of the cars in a distinctive fashion (plan). The district court's approach gives short shrift to these differences.

Because we are confronted here with a careful exercise of discretion, I think we may properly affirm, and Judge Ripple very persuasively details the reasons why. But this is a close call because it is difficult to believe that a jury could view the machinations with the additional 13 vehicles as being other than conduct for which the defendant should be held criminally liable—or at least as going to his proclivity to violate the law.

evidence to survive a motion for a directed verdict. The district court was probably expressing a willingness to revisit the admissibility of the challenged evidence, a normal trial practice.