**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Robert Lee STOKES, Defendant–Appellant.**

No. 02–3737.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 2003.

Decided May 19, 2003.

---

Before FLAUM, Chief Judge, RIPPLE, and WILLIAMS, Circuit Judges.

## ORDER

Robert Lee Stokes was convicted of conspiracy to possess with intent to distribute cocaine in violation of 18 U.S.C. § 841(a)(1) and 18 U.S.C. § 846. Mr. Stokes filed two motions for a new trial, based on alleged ineffective assistance of counsel at trial and on an alleged violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), respectively. The district court denied both motions; Mr. Stokes appealed. For the reasons set forth in the following order, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. Facts

**1.**

In late 1998, Mr. Stokes was dating Lakesha Miller. After Miller became

pregnant with Mr. Stokes' child, Mr. Stokes told Miller that he would take care of her and their child; specifically, he told Miller that he was going to "[s]ell cocaine." Tr. Vol. 3 at 189.

On January 13, 1999, Miller was with Mr. Stokes at the home of his nephew, Willard Williams, where Mr. Stokes had arranged for Miller to live.[1] On that day, Miller observed Mr. Stokes and a man named Glenn cook cocaine. Mr. Stokes later told Miller that Glenn had brought cocaine to him from Texas. Mr. Stokes, in turn, distributed the cocaine to his dealers that same evening. Some of those dealers, such as Williams, received the cocaine directly from Mr. Stokes; with respect to at least one other dealer, Benjamin Hickman, Mr. Stokes left the cocaine with Miller for the dealer to pick up. Mr. Stokes fronted the drugs to his dealers who paid him after they had resold the cocaine.

In February 1999, Miller found out from Hickman that Glenn had delivered another shipment of cocaine to Mr. Stokes. When Miller asked Mr. Stokes about this, he confirmed that he had received an additional amount of cocaine from Glenn and had given some of the cocaine to Williams and some to Hickman.

Mr. Stokes also told Miller about a trip to Texas that he was planning to take on February 12, 1999; he planned to meet Glenn and to obtain a much larger quantity of cocaine. Mr. Stokes told Miller to make airline reservations for him to San Antonio, Texas, and to make the reservations in the name of his brother, John Stokes. Mr. Stokes provided Miller with his brother's identification to assist her in making the arrangements. Miller took notes of the instructions given by Mr. Stokes.[2]

### 2.

Around this time, the FBI received information from a confidential informant that crack cocaine was being sold out of a house at 4629 Jackson Street in Gary, Indiana. The informant provided the FBI with a description of the person operating the crack house. The investigating officers approached the house and identified themselves. Hickman, who fit the informant's description, saw the police, ran between two houses and attempted to flee on foot. He was apprehended just behind the residences. Immediately after Hickman was taken into custody, the officers found "a sandwich bag filled with ... dime bags of crack cocaine right in the path where [Hickman] had run." Tr. Vol. 5 at 284. Hickman later told law enforcement officers that he had obtained the cocaine from Mr. Stokes.

Hickman agreed to cooperate with the authorities; specifically, he agreed to make a series of recorded telephone calls to Miller and Mr. Stokes, and "to set up a controlled delivery of large amounts of cocaine." *Id.* at 289. In the telephone calls, both Miller and Mr. Stokes related that some of the cocaine had arrived from Texas; however, they were reluctant to discuss the cocaine in detail over the tele-

---

1. Prior to this time, Mr. Stokes had been placed in the Bradley House, a residential facility for those in the state criminal justice system. The Bradley House has varying levels of restrictions on personal freedom. At all times relevant to these proceedings, Mr. Stokes lived at the Bradley house and was subject to the most stringent of these restrictions.

2. These notes were later recovered during a search of Williams' house pursuant to warrant. The flight plans, in the name of John Stokes, were confirmed through the records of Southwest Airlines.

phone. Thus, Hickman met Mr. Stokes in person the following day and wore a recording device. During this conversation, Hickman inquired about the cocaine, and Mr. Stokes responded that he had received a kilogram of cocaine ("key") but had given it to Williams to sell because Williams had a scale and Hickman did not. Ex.18A[3] at 6–7.[4] However, Mr. Stokes also told Hickman that he may have some smaller quantities stored nearby; they then agreed to meet the following day so that Mr. Stokes could provide Hickman with some cocaine.

Also during this taped conversation, Mr. Stokes gave Hickman detailed advice about dealing in cocaine. For instance, Mr. Stokes warned Hickman to "discuss nothing over the phone." Ex.18A at 20. Also, continued Mr. Stokes, Hickman should not "chill at no house that you sell dope out of." *Id.* at 22; *see also* Tr. Vol. 5 at 337–38.

The conversation also included a discussion of a large amount of cocaine that Mr. Stokes would receive. Hickman asked Mr. Stokes if he had gotten the "eleven keys" yet; Mr. Stokes responded that he would be making a trip to get the rest of it. Ex.18A at 4. Mr. Stokes told Hickman that when he (Mr. Stokes) returned "after the 12th," he would be able to give Hickman a kilogram of cocaine. *Id.* at 3.

Mr. Stokes did not meet with Hickman the following day, nor make the trip to San Antonio on February 12, 1999. Hickman had told one of Mr. Stokes' associates that he (Hickman) was wearing a wire. Through this associate, Hickman also warned Mr. Stokes not to show for the scheduled meeting.

The following day, when Hickman arrived at the location where the purchase was to take place, Mr. Stokes never arrived. Instead, Mr. Stokes drove around the location several times in a manner consistent with counter-surveillance and ultimately drove away. He later was apprehended.

### 3.

While Mr. Stokes was incarcerated awaiting trial, he called Miller. According to Miller's testimony, Mr. Stokes told Miller that "there was nothing on [her]." Tr. Vol. 3 at 211. He advised her not to talk to law enforcement and to think about taking a trip. Three days later, Williams visited Miller. Miller testified that "[h]e [Williams] told me that I was the only one that could hurt RL and I may want to think about taking a trip." Tr. Vol. 3 at 213. To encourage her to do so, Williams left $5,000 on her living room table. Miller did not accept the money from Williams.

### B. District Court Proceedings

Mr. Stokes was charged with conspiracy to possess with intent to distribute cocaine. At trial, the bulk of the Government's evidence was presented through the testimony of the investigating officers and of Williams, and through the tapes of the conversations between Hickman and Mr. Stokes.[5] Hickman invoked his right to remain silent.

---

3. Exhibit 18 is the actual tape of the conversation. Exhibit 18A is the transcribed conversation, which the jury used as an aid in following the taped conversation, but which was not admitted into evidence. For ease of reference, however, we refer to the transcribed conversation.

4. Later in the conversation, Mr. Stokes explained to Hickman that "[y]ou have to have a scale when you're dealing in keys." Ex. 18A at 6; *see also* Tr. Vol. 5 at 338–39 (explaining the importance of a scale in drug distribution).

5. A defense motion to suppress the taped conversations was denied.

With respect to Mr. Stokes' defense, his trial counsel elicited testimony from Government witnesses that Mr. Stokes did not live in a manner usually associated with those dealing in large amounts of cocaine; he did not own a car, a house or any other assets. In addition, the police did not recover large sums of money or additional stores of cocaine belonging, or linked in some other way, to Mr. Stokes.

Mr. Stokes' counsel also aggressively attacked the credibility of Miller. On cross-examination, Miller admitted that she regularly used cocaine. She further acknowledged that the Government paid her $800 for her cooperation; she was supposed to use this money to relocate, but instead used at least some of it to purchase drugs. Finally, she admitted that she agreed to testify only after being granted immunity.

After hearing the evidence, the jury convicted Mr. Stokes. Subsequently, Mr. Stokes filed a pro se motion for a new trial on the basis that his counsel was ineffective. Mr. Stokes maintained that his counsel should have called various witnesses known to counsel at the time of trial. The district court held two hearings on Mr. Stokes' motion and also appointed Mr. Stokes new counsel for the post-trial proceedings. The motion ultimately was denied.

Mr. Stokes also filed a second motion for a new trial on the basis that the Government withheld exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Mr. Stokes contended that the Government was obligated to provide him with a copy of telephone records that the Government had obtained from the Metropolitan Correctional Facility ("MCC") where he was incarcerated awaiting trial. Mr. Stokes claimed that these records undermined Miller's testimony that a call took place because they did not reveal a direct call

from MCC to Miller around the time that Mr. Stokes allegedly called Miller to convince her not to testify. The district court rejected this argument and denied the motion.

Mr. Stokes appealed.

## II

## ANALYSIS

### A. Ineffective Assistance of Counsel

■ Mr. Stokes first argues that the district court should have granted him a new trial because his trial counsel was constitutionally ineffective. He maintains that his attorney's failure to introduce the testimony of a number of potential witnesses constituted deficient performance and prejudiced him at trial. We review claims of ineffective assistance of counsel de novo according to the principles set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Coleman v. United States,* 318 F.3d 754, 757 (7th Cir.2003).

In order to establish a claim of ineffective assistance of counsel, a defendant must establish (1) that his attorney's performance fell below an objective standard of reasonableness; and (2) that the deficient performance was prejudicial. *See Strickland,* 466 U.S. at 687. With respect to the first prong of the *Strickland* test, this court's "review of the performance of counsel must be 'highly deferential.'" *Hough v. Anderson,* 272 F.3d 878, 890 (7th Cir.2001) (quoting *Strickland,* 466 U.S. at 689). "We must presume that counsel's conduct falls within the wide range of reasonable professional assistance; to prevail, the defendant must overcome the presumption that the challenged act or omission might have been considered sound trial strategy." *Id.* With respect to the second prong, a defendant must show that

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "If the defendant makes an insufficient showing on one prong of the test, a court need not consider the remaining prong." *Id.*

As noted above, Mr. Stokes believes that his counsel was ineffective because he failed to call witnesses at trial that either would have impeached testimony of Government witnesses or would have bolstered Mr. Stokes' defense. Each of the proposed witnesses will be discussed below.

### 1. Donald Bennett

Donald Bennett was an inmate at MCC with Stokes and Hickman during the time that Mr. Stokes was awaiting trial. Bennett was awaiting trial on a charge of wire fraud; with respect to this charge, he had raised insanity as a defense. Bennett had several other convictions, including forgery and bank robbery; Bennett had raised insanity as a defense in some of these proceedings and, with respect to at least one other charge, had been declared incompetent to stand trial. In addition to having a long criminal history, Bennett suffered from schizophrenia, specifically bipolar disorder. The disorder had caused him to suffer memory loss, and he had been treated for mental disease numerous times while incarcerated. If called at trial, Bennett was prepared to testify that, in his presence, Hickman had admitted six or seven times that he (Hickman) lied to the police when he told the police that he had obtained cocaine from Mr. Stokes.

During the hearings on Mr. Stokes' motion for a new trial, his former trial counsel acknowledged that Mr. Stokes had provided Bennett's name as a possible witness. However, after discussing Bennett and Bennett's statements with Mr. Stokes, trial counsel determined that Bennett's testimony was inadmissible hearsay. Additionally, given Bennett's history of criminal activity and mental illness, it was trial counsel's opinion that Bennett would not have made a very credible witness.

Mr. Stokes argues that this assessment was incorrect. Mr. Stokes believes that Hickman's statements were statements against penal interest and, therefore, fell within one of the enumerated exceptions to the hearsay rule contained in Federal Rule of Evidence 804. According to Mr. Stokes, the statements subjected Hickman to a charge of false reporting because Hickman previously had told the police that Mr. Stokes was his source of cocaine.

We believe, however, that trial counsel's decision not to call Bennett as a witness is "within the wide range of reasonable professional assistance." *Hough,* 272 F.3d at 890. We turn first to whether Hickman's out-of-court statement falls within an exception to the hearsay rule. Federal Rule of Evidence 804 provides in relevant part:

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . .

(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed.R.Evid. 804(b)(3). "In determining the admissibility of a statement under Rule 804(b)(3), we require that three elements be met: (1) the declarant must be unavailable; (2) the statement must be against the declarant's penal interest; and (3) corroborating circumstances must exist indicating the trustworthiness of the statement." *United States v. Robbins*, 197 F.3d 829, 838 (7th Cir.1999); *see also United States v. Hall*, 165 F.3d 1095, 1112 (7th Cir.1999) ("Rule 804(b)(3) *expressly* requires the exclusion of out-of-court statements offered to exculpate the accused unless there are corroborating circumstances that 'clearly indicate' the trustworthiness of the statement." (emphasis in original)). The proponent of the out-of-court statement bears the burden of showing that these requirements have been met. *See Robbins*, 197 F.3d at 838.

Evaluating Bennett's statements according to this tripartite test, there is no question that Hickman's invocation of his Fifth Amendment right to remain silent rendered him "unavailable" for purposes of Rule 804. *See* Fed.R.Evid. 804(a)(1) (" 'Unavailability as a witness' includes situations in which the declarant—(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement...."); *Martinez v. McCaughtry*, 951 F.2d 130, 134 (7th Cir. 1991) (stating that individual "exercised his right to remain silent at trial and therefore was unavailable" for purposes of Rule 804). Furthermore, Hickman's statements arguably were against his penal interests.[6] However, Mr. Stokes does not point to any corroborating circumstances that suggest that Hickman's statements to Bennett were trustworthy. In the absence of evidence "that 'clearly indicate[s]' the trustworthiness of the statement[s]," Hickman's testimony is not admissible pursuant to Rule 804(b)(3). *Hall*, 165 F.3d at 1112. Consequently, Mr. Stokes' trial counsel was not ineffective in failing to offer them.

In addition to the substantive shortcomings of Bennett's proposed testimony, Bennett had significant credibility problems. Bennett not only was a convicted felon, but suffered from a mental illness that affected his perception and memory. Indeed, in the past he had been declared incompetent to stand trial. We believe, therefore, that it was a reasonable tactical decision on the part of Mr. Stokes' trial counsel to refrain from calling Bennett as a witness.

### 2. Edward Krecioch

Like Bennet, Edward Krecioch (also an inmate at MCC) was prepared to testify that he, too, overheard Hickman state that he (Hickman) was lying with respect to who supplied his cocaine. At the time that Hickman made the alleged statements, Krecioch was serving a ten-year sentence for conspiracy and cocaine distribution. As with Bennett's statements, Mr. Stokes fails to come forward with any corroborating circumstances that suggest Krecioch's proposed testimony is reliable. Additionally, Krecioch suffers from some of the same credibility issues as Bennett. Consequently, we cannot say that failing to call Krecioch fell outside the realm of reasonable representation.

---

6. Hickman previously had told investigating officers that Mr. Stokes had provided him with the cocaine. Consequently, because the subsequent statements suggested that the prior statements were false, the subsequent statements could subject Hickman to a charge of making a false or misleading statement to a government agency pursuant to 18 U.S.C. § 1001. *See United States v. Rodgers*, 466 U.S. 475, 481–82, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984) (holding that individual may be held liable pursuant to 18 U.S.C. § 1001 for making false statements to the FBI).

### 3. Darlene Stokes Sumrall

■ Darlene Stokes Sumrall, Mr. Stokes' ex-wife, was another potential witness whose name Mr. Stokes provided to his trial counsel. If called at trial, Sumrall would have testified that Mr. Stokes had asked her for money several times while he was living at the Bradley House.

We do not believe that Mr. Stokes' trial counsel was constitutionally ineffective for failing to call Sumrall at trial. "The Constitution does not oblige counsel to present each and every witness that is suggested to him. In fact, such tactics would be considered dilatory unless the attorney and the court believe the witness will add competent, admissible and non-cumulative testimony to the trial record." *United States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir.1990). Sumrall's testimony was largely cumulative of that elicited through the investigating officers who testified to Mr. Stokes' apparent lack of assets. *See* Tr. Vol. 3 at 176–77. Consequently, because the substance of Sumrall's testimony was presented through other, perhaps less biased, witnesses, the decision of Mr. Stokes' trial counsel not to call Sumrall was reasonable.

### 4. John Stokes

■ Mr. Stokes also had suggested that his counsel consider his brother, John Stokes, as a witness. John Stokes would have testified that, although he had loaned his fishing and driver's licenses to Mr. Stokes frequently, John Stokes did not loan his identification to Mr. Stokes in February 1999. During the hearing on the motion for a new trial, Mr. Stokes' trial counsel testified that he and Mr. Stokes had discussed his brother's testimony, and, although counsel could not recall the precise nature of the testimony, counsel had concluded that "[i]t wasn't something that was going to rebut the government's evidence." Tr. Vol. 9 at 68.

We believe that counsel's determination not to call John Stokes also was a reasonable, tactical decision. Although John Stokes would have testified that he did not recall loaning his fishing and driver's licenses to his brother in February 1999, John Stokes also would have testified that "when he [Mr. Stokes] got them, he didn't bring them back the same day he received them. When he got the fishing license ... he always held on to them." *Id.* at 32. Referring to the licenses, John Stokes also noted that "he takes it a lot," *id.* at 37. The whole of John Stokes' testimony, therefore, actually may have bolstered the Government's case against Mr. Stokes—by showing that he often was in possession of his brother's identification—more than it would have assisted Mr. Stokes. Consequently, it was a reasonable decision not to call John Stokes as a witness.

### 5. Lester Norvell

Lester Norvell was a caseworker at the Bradley House while Mr. Stokes lived there. According to Mr. Stokes' trial counsel, Mr. Stokes never presented Norvell to him as a potential witness prior to trial. Nevertheless, if called, Norvell would have testified that Mr. Stokes had to sign in and out of Bradley House and was allowed to leave only for certain reasons. Furthermore, Norvell would have testified that it was not possible for Mr. Stokes to travel to San Antonio without violating the terms of his release. However, even if Mr. Stokes' attorney had known about Norvell, it would have been a reasonable decision not to call Norvell at trial. Norvell's testimony would have opened the door to questions concerning the many restrictions imposed on Mr. Stokes while living at the Bradley House and why those restrictions

were imposed.[7] Such information may have given the jury the impression that Mr. Stokes was violent, dangerous, or, at the very least, needed to have his behavior curtailed in some manner. Therefore, it is questionable whether Norvell's testimony would have, on par, benefitted Mr. Stokes.

Because trial counsel's decisions not to call the proposed witnesses constituted "sound trial strategy," *Hough,* 272 F.3d 878, Mr. Stokes was not denied effective assistance of trial counsel. Consequently, the district court did not err in denying Mr. Stokes' motion for a new trial on this basis.

### B. Alleged *Brady* Violation

■ Mr. Stokes also argues that the Government had in its possession certain exculpatory evidence that should have been disclosed pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Mr. Stokes maintains that the Government possessed telephone records from the MCC that spanned the time during which Mr. Stokes allegedly called Miller to try to convince her not to testify. These records, continue Mr. Stokes, do not reveal any direct calls to Miller and, therefore, undermine Miller's testimony that a call was made. This court reviews a district court's denial of a new trial based on an alleged *Brady* violation for an abuse of discretion. *See United States v. Wilson,* 237 F.3d 827, 831 (7th Cir.), *cert. denied,* 534 U.S. 840, 122 S.Ct. 97, 151 L.Ed.2d 57 (2001).

In its analysis, the district court first set forth the elements of a *Brady* claim: "To be entitled to a new trial as a result of a *Brady* violation, the defendant must establish that: (1) the prosecution suppressed the evidence; (2) the evidence was favorable to the defendant; and (3) the evidence

was material to the case." R.201 at 6 (citing *United States v. Asher,* 178 F.3d 486, 496 (7th Cir.1999)). With respect to the first issue—whether the Government suppressed the telephone records—the district court stated that

> "[e]vidence cannot be regarded as 'suppressed' by the government when the defendant has access to the evidence before trial by the exercise of reasonable diligence. Regardless of whether the evidence was material or even exculpatory, when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no Brady claim."

*Id.* at 7–8 (quoting *United States v. White,* 970 F.2d 328, 337 (7th Cir.1992); additional internal quotation marks and citations omitted). Because Mr. Stokes could have obtained MCC's telephone records by issuing a subpoena for them, the court determined that the records were equally available to Mr. Stokes and the Government. Consequently, the court held that the Government had not "suppressed" the evidence.

■ The district court also found that the MCC telephone records were not material. According to the court, the only use for the telephone records was to show that Miller had lied as to matters in her testimony. Whether this impeachment evidence had a reasonable likelihood of affecting the outcome of the trial, continued the court, " 'depends upon a number of factors such as the importance of the witness to the government's case, the extent to which the witness has already been impeached, and the significance of the new impeaching material on the witness' credi-

---

7. There is evidence in the record that Mr. Stokes' trial counsel did not want the jury to know about the restricted living conditions at the Bradley House. *See* Tr. Vol. 3 at 240–42.

bility.' " R.201 at 9 (quoting *United States v. Anderson,* 724 F.2d 596, 598 (7th Cir. 1984)). Although Miller was an important witness, she "was thoroughly impeached" in many other ways. *Id.* at 10. Furthermore, the district court stated, Mr. Stokes' conviction was based on other substantial evidence. The court therefore concluded that the MCC records would not have resulted in a different verdict had they been presented.

As noted above, the burden was on Mr. Stokes to establish a *Brady* violation. *See United States v. Wilson,* 237 F.3d 827, 832 (7th Cir.2001); *United States v. White,* 970 F.2d 328, 337 (7th Cir.1992). We do not believe that Mr. Stokes has met his burden. First, Mr. Stokes does not explain, in light of this court's precedent, how the Government "suppressed" the evidence. The district court found that the MCC records were equally available to Mr. Stokes had he issued a subpoena for them. *See* R.201 at 8.[8] When documents are equally available to both parties through the exercise of reasonable diligence, the Government cannot "suppress" the documents within the meaning of *Brady.* "*Brady* does not oblige the Government to provide defendants with evidence that they could obtain from other sources by exercising reasonable diligence. When evidence is available equally to the defense and the prosecution, the defendants must bear the responsibility for their failure to diligently seek its discovery." *United States v. Dula,* 989 F.2d 772, 776 n. 9 (5th Cir.1993). Because Mr. Stokes has not shown that the Government "suppressed" the MCC telephone records, we must conclude that no *Brady* violation occurred.[9]

## Conclusion

Mr. Stokes' claims are without merit. He has not established that his trial counsel's performance fell below the level of reasonable professional representation, nor has he met his burden with respect to showing a *Brady* violation. The judgment of the district court, therefore, is affirmed.

AFFIRMED

---

8. Mr. Stokes does not argue that the district court erred in making this determination.

9. Furthermore, in order to prevail on his *Brady* claim, Mr. Stokes had to establish that the withheld documents would have affected the outcome of the trial. Mr. Stokes has not done so. As noted by the district court, Miller's credibility had been called into doubt in many ways by defense counsel; the additional ambiguous evidence provided by the MCC records would not have done significant additional damage to her testimony. However, even if the MCC records would have caused the jury to hesitate in believing any of Miller's testimony, there was still substantial evidence of guilt, namely the taped conversations, Miller's notes and the documented flight reservation.